489 S.E.2d 792

**STATE of West Virginia, Appellee,**

v.

**Julie WYATT, Appellant.**

No. 23260.

Supreme Court of Appeals of West Virginia.

July 16, 1997.

WORKMAN, Justice, dissenting:

I write separately because the majority has endorsed an opinion that is wrong not only on its basis for reversal, but also because it is written in such a confusing manner that it will leave the trial courts in the difficult position of trying to ascertain what legal principles the majority has attempted to enunciate.

### I. The Alleged Instructional Error

The majority reverses this conviction by treating an alleged instructional error that was totally unpreserved in the record as plain error. This flies in the face of the recent very well-reasoned decision in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), where we held that courts should be very cautious and conservative in recognizing plain error. *Id.* at 316–17, 470 S.E.2d at 635–36.

West Virginia Code § 61–8D–2 (a) and (b) (1992) (emphasis added) provide as follows:

(a) If any parent, guardian or custodian shall maliciously and intentionally *cause the death* of a child under his or her care, custody or control *by his or her failure* or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be *guilty of murder in the first degree.*

(b) If any parent, guardian or custodian shall *cause the death* of a child under his or her care, custody or control *by knowingly allowing* any other person to maliciously and intentionally fail or refuse to supply such child with necessary food,

clothing, shelter or medical care, then such other person and such parent, guardian or custodian shall each be *guilty of murder in the first degree.*

Thus, pursuant to statute, murder by the parent, guardian, or custodian can be proven *either:* (1) by intentionally and maliciously causing a child's death by failure to provide medical care or (2) by causing a death of a child by knowingly allowing another person to maliciously and intentionally refuse medical care. Instruction number six in the Appellant's trial provided as follows:

> The Court instructs the jury that the defendant, Julie Wyatt, stands charged in Count 3 of the Indictment with Murder of a Child by Failure to Provide Medical Care.
>
> A person is guilty of this offense when he or she is the custodian of a child and maliciously, intentionally, and with pre-mediation [sic] fails to supply said child necessary medical care, or knowingly allows another person to do so, causing the child's death.
>
> . . . .
>
> Therefore, if you find from the evidence beyond a reasonable doubt that Julie Wyatt was the custodian of Derek Browning, a minor child, and that she maliciously, intentionally, and with mediation [sic] failed to supply the child necessary medical care, causing the child's death, then you should find her guilty of Murder by Failure to Provide Medical Care as charged in Count 3 of the Indictment.

The only possible inconsistency between the statute and the instruction is that subsection (a) of the statute says "maliciously and intentionally cause the death of a child" by failure to provide care, while the instruction says maliciously and intentionally fails to supply care, causing the child's death.[1] Although no objection to what at best may be characterized as an arguable variance was made at trial, it constitutes the basis for the majority's determination of plain error.[2]

As we recently reiterated in syllabus point eight of *State v. Garrett,* 195 W.Va. 630, 466 S.E.2d 481 (1995), " '[t]he general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection.' Syl. pt. 3, *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982)." We determined in *Garrett* that the appellant had failed to preserve the issue for appellate review, citing the requirement in Rule 30 of the West Virginia Rules of Criminal Procedure that " '[n]o party may assign as error the giving or the refusal to give an instruction … unless he objects thereto before the arguments to the jury are begun, stating distinctly the matter to which he objects and the grounds of his objection[.]' " *Id.* at 643, 466 S.E.2d at 494.

Regarding our utilization of the plain error doctrine, we stated in syllabus point two of *State v. Hutchinson,* 176 W.Va. 172, 342 S.E.2d 138 (1986), that although we have authority under Rule 30 to "notice plain error in the giving of an erroneous instruction (in the absence of a proper and timely objection at trial), this Court will not ordinarily

---

1. We also note that this identical inconsistency exists within the language of the statute itself. Subsection (a) employs the phrase "shall maliciously and intentionally cause the death … by … failure or refusal to supply" while subsection (b) employs the phrase "shall cause the death of a child … by knowingly allowing any other person to maliciously and intentionally fail or refuse to supply such child with necessary … [care]." W. Va.Code § 61–8D–2(a), (b). Consequently, there is a potential for confusion regarding whether a person is required to have *intentionally caused the death* or *intentionally failed to supply care,* which then resulted in death.

2. We also note the issue of duplicity of charges and the argument that the jury could have been confused regarding whether the Appellant, was

being found guilty of personal failure to provide or simply allowing another person to fail to provide. Any resulting potential for confusion by failure to segregate the two statutory elements and spoon-feed the statute to the members of the jury was certainly harmless and does not constitute reversible error. Further, there was no dispute that the potential "other person" (the Appellant's boyfriend, who was the victim's father) was not present at the time Derek was deprived of treatment and died. An examination of the record reveals countless references to the charges against the Appellant and indicates that the jury was properly advised concerning the circumstances under which it could find the Appellant guilty.

recognize plain error under such circumstances, even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial."

In syllabus point seven of the very recent *LaRock* decision, we concisely delineated the contours of the plain error doctrine, as follows:

> An unpreserved error is deemed plain and affects substantial rights **only** if the reviewing court finds the lower court skewed the **fundamental fairness or basic integrity of the proceedings in some major respect.** In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be **exercised sparingly** and should be reserved for the correction of those **few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.**

196 W.Va. at 299, 470 S.E.2d at 618 (emphasis added). While we reviewed the rationale for these conservative limits to the plain error doctrine in *LaRock,* the majority appears to have disregarded the parameters of the plain error doctrine set forth therein. In *LaRock,* we observed:

> " 'One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result' in the imposition of a procedural bar to an appeal of that issue." *[State v.] Miller,* 194 W.Va. [3] at 17, 459 S.E.2d [114] at 128 [(1995)], quoting *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir. 1994) (en banc), cert. denied, 513 U.S. 1196, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995).

196 W.Va. at 316, 470 S.E.2d at 635. We aptly recognized that "in general, the law ministers to the vigilant, not to those who sleep on their rights." *Id.* While the plain error doctrine permits appellate correction of unpreserved error, we noted that appellate courts should use this tool sparingly, and only "in the most egregious circumstances." *Id.*

The *LaRock* opinion enumerated the prerequisites for the application of the plain error doctrine, as follows:

> To satisfy the plain error standard, a court must find: (1) there was error in the trial court's determination; (2) the error was plain or obvious; and (3) the error affected "substantial rights" in that the error was prejudicial and not harmless. 194 W.Va. at 18, 459 S.E.2d at 129, *citing United States v. Olano,* 507 U.S. 725, 730–732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (1993). If these criteria are met, this Court may, in its discretion, correct the plain error if it " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Olano,* 507 U.S. at 732, 736, 113 S.Ct. at 1776, 1779, 123 L.Ed.2d at 518, 521, *quoting United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936).

196 W.Va. at 316–17, 470 S.E.2d at 635–36.

We also instructed in *LaRock* that "[e]ven when all three prerequisites are established, whether to correct error remains discretionary with the appellate court." *Id.* at 317, 470 S.E.2d at 636. Recognizing the instruction of the United States Supreme Court in *Olano,* on the issue of the exercise of such discretion, we concluded in *LaRock* that "[w]e should correct error which caused a 'miscarriage of justice,' that is, conviction of an innocent person." *Id.* That is clearly not what occurred here. Defense counsel acknowledged that the Appellant was present over an extended period of time—several days—of almost constant extreme abuse of this child and did not seek medical assistance. *See infra* note 3.

We have established a significantly detailed standard for the utilization of the plain error doctrine. Yet, the majority seems unwilling to be bound by such cogent precedent. I certainly am unable to conclude that these instructions, as well as the fact that the Appellant was permitted to fully argue her theory of the case, resulted in a miscarriage of justice or an error seriously affecting the fairness, integrity, or public reputation of judicial proceedings. Therefore, I vociferously dissent. It is my hope that the majority's decision in this matter does not

represent a departure from the standards so correctly and cogently identified in *LaRock* and its predecessors. The plain error rule was never intended to be implemented as a curative device for every unpreserved error raised at the appellate level. The majority's use of the plain error device in the present case is grossly erroneous.

## II. Appropriate Utilization of the Battered Woman's Syndrome Evidence

The majority writes: "[w]e cannot conclude that the trial judge committed reversible error in limiting the testimony of Dr. Veronen to psychological testimony relating to Ms. Wyatt's state of mind and prohibiting her testimony on battered women's syndrome." 198 W.Va. at 541, 482 S.E.2d at 158. Such statement would lead the reader to the believe that the majority did not intend to disturb the ruling of the lower court and affirmed in that regard. Yet a few short lines later, the majority somewhat paradoxically continues by stating that the "retrial will present ample opportunity ... to revisit the issues presented by Dr. Veronen's testimony." *Id.*

The lower court ruled that Dr. Veronen would be permitted to testify regarding the Appellant's "state of mind," but would not be permitted to testify regarding the battered woman's syndrome as a defense. Yet, as the majority recognizes, the defense somewhat surprisingly decided not to introduce any testimony of Dr. Veronen. Having had the opportunity to present expert testimony concerning the issue of the Appellant's state of mind at the time of Derek's death, the de-fense failed, for whatever reason, to offer such evidence. While the majority initially states that it did not find reversible error in the lower court's decision to limit testimony, it thereafter hints that the issue should be reexamined, potentially allowing the defense another bite at the same apple it previously declined.

The majority also presents a perplexing morass of comments apparently designed to provide guidance to the lower court in this area of the law in which the majority had previously found no reversible error. The majority correctly noted that the "principal use of the battered women's syndrome testimony has been in the context of self-defense, in cases where the battered person is accused of murdering her batterer." 198 W.Va. at 541, 482 S.E.2d at 158. The majority also aptly noted that our *Lambert* opinion, in which we recognized that a history of domestic violence, can be a factor which may negate criminal intent, dealt with the issue of the batterer coercing the battered woman to participate in fraud and the woman's subsequent right to a coercion instruction. *State v. Lambert*, 173 W.Va. 60, 64, 312 S.E.2d 31, 35 (1984). The majority is also correct in its recognition that the present case contains no "direct connection" between the prohibited conduct (failure to provide medical care) and the risk of further battering.[3] 198 W.Va. at 541, 482 S.E.2d at 158.

Yet, having assembled this collection of accurate assertions, the majority stumbles aimlessly. Building what at first blush appears to be the basis for a reasonable conclusion, the majority abruptly changes course

---

3. We do note the Appellant's assertions that she feared physical punishment from Derek's father if she chose to seek medical attention, thereby revealing the child abuse which had occurred. Yet, the Appellant did not refrain from confronting Mr. Browning when he arrived at the hospital after Derek's collapse and accused her of child abuse. At that point, the record reveals that the Appellant became enraged and responded with child abuse allegations against Mr. Browning. The undisputed evidence indicated that Derek had been tortured for several days prior to his collapse into a coma on February 4, 1994. He had been beaten, suffering forty contusions over his body, multiple severe blunt force injuries to his skull, spinal cord hemorrhage from shaking and abuse, and blackened bruised feet from being hit with a spoon. This was not an isolated incident, nor was the Appellant unaware of the seriousness of the multiple injuries. The Appellant admits looking on as Derek's father forced him to run from room to room of their trailer until Derek's asthma caused him to stop from exhaustion, watching Derek's father beat the child's feet and head with a spoon, witnessing the father shake Derek until his head flopped back and forth, and seeing the father continually hit Derek's forehead so hard that he fell backward, banging his head on the floor and eventually causing a bald area on the child's head.

and impliedly, although not expressly, finds that evidence of the battered woman's syndrome may be introduced as a legitimate basis for negating criminal intent with regard to a two-year-old child, dependent only upon a showing of admissibility under the standards governing expert scientific evidence.

So, what has the majority constructed? No reversible error was found in the lower court's decision to prohibit evidence of the battered woman's syndrome. Yet, issues of the testimony may be "revisit[ed]" on retrial, and "expert testimony may tend to establish either the lack of malice, intention, or awareness, and thus negate or tend to negate a necessary element of one or the other offenses charged." Slip op. at 23, 25, 198 W.Va. at 541, 542, 482 S.E.2d at 158, 159. The majority opinion leaves the reader immensely confused.

The majority accurately assessed the typical and principal use of the battered woman's syndrome, yet failed to properly apply that standard to this case. That is the juncture at which the majority so fatally veered. Our prior cases on the issue of negating criminal intent have involved the relationship between the batterer and the battered individual. In *Lambert*, the batterer, by physical threats specifically indicating that the defendant was not permitted to inform the Department of Welfare about current employment status, forced the defendant to assist in the commission of fraud. 173 W.Va. at 62, 312 S.E.2d at 33. In a prosecution for first-degree murder in *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979), wherein defendant's primary theory of defense was self-defense, we held that the defendant would be entitled to elicit testimony about prior physical beatings she received from the victim, explaining that the jury could thereby fully evaluate and consider defendant's mental state at time of commission of offense. *Id.* at 195, 255 S.E.2d at 555. The defendant in *Dozier* had shot and killed a man with whom she had been inter-

mittently cohabiting for approximately ten years. *Id.*

If the majority intends the result that it appears to have reached, this represents a significant and virulent expansion of our prior pronouncements regarding the methods through which criminal intent can be negated and the scope of the battered woman's syndrome as a defense to criminal conduct. Our prior cases permitting evidence of physical abuse to negate criminal intent involved the relationship between the batterer and the battered individual, not harm to a third innocent person. Perhaps this Appellant could have legitimately employed the battered woman's syndrome as a defense if she had murdered Mr. Browning. But the majority implies that it may also be used to negate her criminal intent when charged with intentional and reckless killing by failure to provide medical care to a third party, a small child in her care, at a time when the alleged batterer wasn't even present. I vehemently disagree, especially under the evidence in this case.

The majority accurately stated that evidence of the battered woman's syndrome, to be considered, must meet the qualifications for admissibility of scientific evidence, and the expert must be properly qualified.[4] However, the second and more pivotal issue is under what circumstances such evidence is admissible. Thus, it is not the general acceptance of the battered woman's syndrome with which I now take issue, but the question of the purpose for which the evidence is introduced within a given case. The Ohio General Assembly has recognized this distinction and has enacted legislation recognizing and adopting the battered woman's syndrome as scientifically viable, yet limiting its admissibility to cases in which certain elements are present. Specifically, the Ohio statute, provides, in pertinent part, as follows:

If a person is charged with an offense involving the use of force against another and the person, as a defense to the offense

---

4. In 1992, the Court of Criminal Appeals of Oklahoma noted that expert testimony concerning battered woman's syndrome had been accepted in at least 31 states. *Bechtel v. State*, 840 P.2d 1, 7 (Okl.Crim.App.1992). *See* Schroeder, *Using Battered Woman Syndrome Evidence in the Prose-*

*cution of a Batterer*, 76 Iowa L.Rev. 553 (1991); Cynthia L. Coffee, *Note, A Trend Emerges: A State Survey on the Admissibility of Expert Testimony Concerning the Battered Woman Syndrome*, 25 J.Fam.L. 373 (1986–87).

charged, raises the affirmative defense of self-defense, the person may introduce expert testimony of the "battered woman syndrome" and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary, as an element of the affirmative defense, to justify the person's use of the force in question.

Ohio Rev.Code Ann. § 2901.06(B) (Anderson 1996).

In *State v. Lundgren*, No. 90–L–15–125, 1994 WL 171657 (Ohio App. April 22, 1994), the appellant sought reversal of her convictions of complicity in the commission of murder, conspiracy to commit murder, and kidnapping. These counts were based upon an incident in which two adults and three children were murdered as part of a religious sacrifice organized by the appellant's husband. In arguing that the battered woman's syndrome was relevant to her claim of duress, the appellant sought to introduce evidence of the syndrome and appealed the lower tribunal's decision to exclude the evidence. The *Lundgren* appellate court agreed with the lower court and held that such testimony, in accordance with *State v. Pargeon*, 64 Ohio App.3d 679, 582 N.E.2d 665 (1991), was only admissible where the affirmative defense of self-defense is asserted. The appellant sought extension of the rule to include the scenario where the battered woman attacks a third party because the abuser directs her to do so. The *Lundgren* court explicitly declined to so extend the rule, holding that the limitation as enunciated in the statute was controlling, and that only where self defense has been raised will evidence of the battered woman's syndrome be admissible.

Opinion testimony on the battered woman's syndrome is properly limited to the context of self-defense claims by a woman claiming to be a battered woman.[5] Permitting expansion of the utilization of such evidence is imprudent. In *State v. Mott*, 183 Ariz. 191, 901 P.2d 1221 (Ariz.App.1995), the lower court permitted evidence of the battered woman's syndrome in a defendant's attempt to negate criminal intent in a child abuse charge, reasoning that such evidence provided information probative of the woman's behavior. The Arizona Supreme Court granted review of that opinion, and in *State v. Mott*, 187 Ariz. 536, 931 P.2d 1046 (1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 1832, 137 L.Ed.2d 1038 (1997), determined that expert testimony challenging the element of knowledge or intent on the child abuse counts was inadmissible. The expert had "concluded that defendant was a battered woman and that being a battered woman was relevant to her ability to protect her children." *Id.*, 931 P.2d at 1049. Moreover, the expert explained that her status as a battered woman prohibited her from being able to decide to seek medical attention for the child. *Id.*, 931 P.2d at 1050. The Supreme Court noted that evidence of battered-woman syndrome had ordinarily been offered in self-defense cases and that it need not address the admissibility of the battered woman defense in self-defense cases since the evidence was not presented for that purpose in the *Mott* case. Thus, it was the defendant's purpose in offering the testimony that was the focus of the analysis. Such evidence was offered "to demonstrate that defendant was not capable of forming the requisite mental state of knowledge or intent," and the Supreme Court found such evidence inadmissible in the child abuse case. *Id.* While it is a sociological reality that battered women are generally less able to protect children, that tragic phenomenon should not constitute a legal defense to crimes against the children.

In *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988), a woman convicted of felony murder, kidnapping, robbery, and battery con-

---

5. Even when permitted in the self-defense context, a foundation for such evidence should be required and well-delineated. As recognized in *State v. Stringer*, 271 Mont. 367, 897 P.2d 1063 (1995), "there first must be evidence of a battered victim before expert testimony on the syndrome may be admitted." *Id.*, 897 P.2d at 1070. An appropriate foundation, according to the *Stringer* court, would include "substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior." *Id.*

tended that expert testimony of the battered woman's syndrome should be introduced in her efforts to prove that her boyfriend threatened her into committing the crimes. Restating the general principle that battered woman syndrome evidence is admissible where self-defense has been asserted by a woman who has committed a crime against her batterer, the court rejected the appellant's attempt "to intertwine the battered wife syndrome with the statutory defense of compulsion either to justify the crimes committed against innocent third parties or to show that she was compelled to be at the crime scenes." 758 P.2d at 725.

The validity of the battered woman's syndrome and its utilization within the context of the affirmative defense of self-defense where a woman is accused of criminal action toward her abuser is well-accepted. It is improvident, however, for the majority to implicitly enlarge the scope of its use, particularly in the absence of full briefing and argument on that issue before this Court. While the legal system's response to domestic violence is one of the most significant issues facing the judiciary in West Virginia, and one that I am personally committed to addressing, I cannot adhere to the view that its victims can escape legal accountability for harming other innocent third persons, especially children who must rely on their caretakers for protection.

Perhaps the most disturbing feature of the majority opinion is its unclarity. Opinions of this Court should be clear to the reader. They should elucidate, not obfuscate, the issues. They should clarify, not confuse. The instant majority opinion leaves us all in doubt what the law is, and that is its greatest failing.