513 S.E.2d 147

**STATE of West Virginia, Appellee,**

v.

**Penny Gail MILLER, Appellant.**

No. 25168.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 12, 1998.

Decided Dec. 14, 1998.

Darrell V. McGraw, Jr., Esq., Attorney General, Allen H. Loughry, II, Esq., Assistant Attorney General, Charleston, West Virginia, Attorney for Appellee.

Stephen Warner, Esq., Kanawha County Public Defender Office, Charleston, West Virginia, Attorney for Appellant.

Prof. Joyce E. McConnell, Esq., West Virginia University College of Law, Morgantown, West Virginia, Amici Curiae, West Virginia Coalition Against Domestic Violence and West Virginia Chapter of National Organization for Women.

PER CURIAM:

In April of 1997, the appellant, Penny Gail Miller, was convicted in the Circuit Court of McDowell County of the first-degree murder of her former husband, David Stinson. The jury did not recommend mercy, and the appellant was consequently sentenced to life imprisonment without the possibility of parole.

Penny Gail Miller did not shoot David Stinson. Stinson was shot to death in February of 1996 by his and the appellant's teenaged son, Christopher Stinson. Christopher Stinson pled guilty as an adult to second-degree murder in his father's death. The appellant was convicted of first-degree murder based on her being a principal in the second degree (or aider and abettor) in the shooting of David Stinson.

The appellant has assigned and briefed a number of alleged errors in the conduct of her trial. She is supported in her argument in the instant appeal with an able brief from the *amici curiae*, the West Virginia Coalition Against Domestic Violence and the West Virginia Chapter of the National Organization of Women.

Upon our review of those asserted errors that were properly preserved at the appellant's trial for review upon a direct appeal, we find that they are not meritorious and therefore do not warrant the reversal of the appellant's conviction. We decline to invoke the plain error doctrine to review those errors that were not properly preserved for direct appellate review. Consequently, we affirm the judgment of the circuit court.

### I.

The evidence at trial showed that the appellant, Penny Gail Miller, a 36–year–old woman, had experienced nearly 2 decades of physical and mental abuse at the hands of David Stinson.

The appellant's expert witness, forensic clinical psychologist Dr. Leroy A. Stone, testified that diagnosing the appellant with Post–Traumatic Stress Disorder was "a very easy call." It was "almost a textbook case." The appellant had "many years of exposure to severe, life threatening, physical abuse, also, psychological abuse from [David Stinson]." Moreover, Dr. Stone testified that the facts supporting the clinical diagnosis of Post–Traumatic Stress Disorder were particularly convincing because, "—in this particular case, there was a great deal of official documentation that was created by other community resources in the past that sup-

ported what [the appellant] had to say ... I had from her a documented personal history that was ... far more extensive than I've seen in, maybe, ninety-nine percent of my cases."

The State's expert witness, a clinical psychologist and West Virginia University professor, Dr. William Fremouw, also testified at the appellant's trial that psychological testing of the appellant "confirm[ed] that she has Post–Traumatic Stress Disorder arising from her abusive relationship with her ex-husband." Dr. Fremouw said, "I feel that she was a battered woman" and "I believe that she really does have Post–Traumatic Stress Disorder."

The relationship between the appellant and David Stinson began when she dropped out of school in the 8th grade [1] to be with David. "He really didn't want me going to school," the appellant told the jury, "so, I quit to be with him." They had a baby, and the appellant married David Stinson when she was 18. "I think on the third day we were married, he beat on me, and I filed [for divorce], but I dropped it. I loved David, and I didn't want to be apart from him." The marriage lasted only 2 years, but the appellant subsequently remarried David Stinson. Their second marriage lasted more than a decade. They had two children: Christopher Lee, and David Cheyenne, who is a year younger than Christopher.

When asked at trial why she remarried David Stinson, the appellant testified that she was afraid "Welfare" would take her children away from her if she did not remarry him. However, Patricia England, an advocate director of Stop Abusive Family Environments (S.A.F.E.), to whom the appellant went for help on a number of occasions, testified that the appellant had told Ms. England that the appellant had also remarried David Stinson out of fear:

I asked her ... when she came back in to ... file another [domestic violence] petition ... why she had remarried him. She had told me then that when she was divorced from David she never knew when he was going to pop up, when he was going

---

[1]. The appellant flunked the first grade, and "several others."

to be outside, or when he was just going to walk into the home, or—but, as long as she was married to him, she always knew where he was. He was right there and she would know where—when to expect the next hit.

"I wasn't allowed to lay out in the sun or wear shorts," the appellant testified, "but I'd been laying out in the sun while David was gone, and I had a bathing suit top on, and I walked over to the bridge, . . . and David started beating on me . . . . He slapped me down, and he beat on me pretty bad that day, and I went off the bridge." The appellant fell 40 feet; the evidence was equivocal as to whether she was pushed or jumped off the bridge. She "was in the hospital for a long time, and when I came to, I had broken hips."

On another occasion, the appellant testified that David Stinson severely cut the appellant's fingers with a butcher knife. The appellant testified:

> . . . as I pulled in [to a convenience store parking lot], David jumped across the fence with a butcher knife in his hand, and he had hid behind my car . . . and . . . David come to me, and had the knife to my throat and he was hollering at [a] man to come out and watch him cut my throat.
>
> I put my hands around the knife, and he just jerked it out of my hands. He cut three fingers and a thumb. They took him—the state police took him, or the counties—they took him to the Steven's Clinic Hospital and made him watch them sew me up. I had lost blood and was in body shock. David stood there and laughed.

Other evidence of physical and psychological abuse of the appellant by David Stinson that was presented to the jury included: his beating the appellant's head into a concrete wall; his attacking the appellant with a two-by-four with protruding nails; his forcing the appellant to have sex with him; his coming home drunk and destroying "every stick of furniture" in the house, television sets, VCRs and other electrical appliances; his destroying the appellant's car with "hammers,

rocks," "removing the alternator," "bust[ing the] window out with a lug wrench" and by "defecat[ing] into the car;" ". . . he would come in and beat on me if he got mad at somebody for something down the road . . . ."

When the appellant and David Stinson were separated, David stalked her. Their son Christopher Stinson testified, "He would hang around, watch her, kind of like, a spy or something;" the appellant "wasn't even allowed to have [her] own friends." In May, 1993 the appellant filed a petition for a restraining order, alleging "threats, staring at her, name calling."

The appellant frequently sought help and protection from David Stinson's abuse. Patricia England testified that between February of 1990 and October of 1995, the appellant had 10 contacts with S.A.F.E. The record of these contacts all involved activities such as seeking restraining orders, filing contempt charges, divorce hearings, and hospitalization due to physical abuse. Dr. Fremouw told the jury that the appellant once escaped to a "shelter in the State of Tennessee as a result of the hands of domestic violence of her husband."

The appellant testified:

Q. Did David ever go to jail as a result of the violence that he inflicted on you?

A. He went, but then he would get out on bond, and then, we never—I would never show up . . . .

Q. How would David react, once you had gone through the trouble of having charges taken out on him?

A. . . . A lot of times when it was time for Court he would buy me things, and he would talk to me and tell me that he loved me, and that it wouldn't happen again, and October of '92, I told David, I said, "David, I've heard that for so many years, 'It'll never happen again.'", and it happens—it's worse every time . . . .

Christopher Stinson testified that most of the time when David Stinson came back home from jail, he was even more angry.[2]

**2.** The State points out that the appellant also testified that after the appellant divorced David

Stinson the first time, they continued to stay together on and off through the years, because

At Christmas 1994, David Stinson beat the appellant again. The appellant again filed for divorce, and they then separated. However, the appellant and David Stinson continued to have some contact, through mutual acquaintances and family members.[3]

the appellant loved David Stinson and did not want to be apart from him.

The State summarizes the evidence of abuse by David Stinson as: "the Appellant alleges that she and David had a very stormy 16–year relationship." The State also points out that a number of the specific abusive incidents described by the appellant occurred a number of years prior to David Stinson's death.

The State further points out the appellant's testimony that on some occasions during their prolonged relationship the appellant "would have sex with David in exchange for a service such as fixing the car or work for the family." The State also points out that the appellant did not discourage David Stinson from visiting his two sons, Christopher and Cheyenne, and said that she never would have prohibited this. "Today I wouldn't. That's his sons."

The State also points out that the appellant knew that Christopher hated David Stinson and had told him several times he did not want anything to do with him. Furthermore, the appellant believed that Christopher had mental problems that needed professional attention. The appellant said that Christopher had received counseling at Southern Highlands and that she had to go to Christopher's school often because he was involved in fights. The appellant said that Christopher had kicked and hit David Stinson on many occasions, even as a small child.

3. There was evidence at the appellant's trial that after the December 1994 separation, at David Stinson's brother's funeral in the fall of 1995, David Stinson "went over to ... say hello to Penny and [her new boyfriend], and [David later told the appellant's sister] he thought about 'cutting their throats right there.'"

Additionally, there was evidence that two weeks before the shooting February 28, 1996, shooting death, David Stinson visited the residence of the appellant's sister and brother-in-law, Patricia and Gary Pickens. "[T]here was a knock on the door," Gary Pickens testified:

... it was David. I told him to come on in, and he sat down.... [H]e said, ... "I'm going to tell you something." He said, "I ain't going to cry," and my wife said, "What do you mean, you ain't going to cry? ... What are you talking about?" He says, "I go up there [to his brother's gave site] and see R.C. [his deceased brother]. If only I would do what R.C. wanted me to do," and he leaned back on the couch, and he said, "Shut up, David. You're talking too much," and my wife responded, said, "No, David. Whatever you've got to say, what's on your mind, you know, go ahead and say it...." [H]e said, "No, I'm talking too much." He said, "But if only I would do what R.C. wanted me to do." ... [H]e's sort of made

it sound like that R.C. was communicating to him from the grave.... [H]e said, "do you know I could blow up that car up sitting over there on the road?" "When they [Penny and Christopher] go over there to get in that car, I could blow them to kingdom come." He said, "And I've even thought about it," and he said, "There was one night that I could've did it." ... and he just went like that, and he said, he said, "This right here's empty ... [t]here's nothing in here no more." (Indicating his chest). He says, "I feel nothing for Penny," and he said, "if that bitch was laying in the ditch over there across the road, I would not piss on her mouth to give her a drink." Then he went on to say, he said, "I could even sneak up there [to the appellant's house] at night and catch that trailer on fire and burn them all to hell...." So, he said, "And I just sharpened this knife up," ... and my wife was terrified by then, when he pulled out the knife.... [H]e, sort of like, leaned over her and reached in his pocket and got the knife out again, and he just held the knife.

Gary's wife, Patricia, also testified about this "kingdom come" conversation:

... [I]t was just kind of scary the way he [talked about doing what his deceased brother told him to do from the grave]... [David said], "I'm going to kill her. I'm going to kill the bitch." ... [H]e pulled his knife from his pocket, and he showed it to my husband and said how sharp it was, and I was afraid that he might cut my husband ... [H]e leaned toward me with the knife and I thought that he might cut me ... because I'm Penny's sister ... [H]e said ... at R.C.'s funeral, ... he went over to the car and said hello to Penny and to John, and he thought that—about cutting their throats right there, ... he said that that night after the funeral that he stood by Penny's car, and he said, "I stood right there at her car, and I was going to do it," that he was going to fix her car, so that when her and [her new boyfriend] went out ... to the car, they could be—blown to kingdom come. ... He said that ... "her little dog, he had cut its head off, and that she was next ... I'm going to kill the bitch. I'm going to do it."

Patricia testified that she told the appellant of this conversation the next day "because I was afraid for her life." "I told her he was scary; that he scared even me; and that I was even afraid for myself—that night."

At the appellant's trial, the prosecution argued that this evidence of threats by David Stinson might be a recent fabrication, basing this argument principally on the fact that the appellant did not immediately describe these threats to the

The appellant's expert, Dr. Stone, testified that with Post–Traumatic Stress Disorder "it's not unusual that the unknown, that which is not seen, may be more fearful than that which is seen," and that even though the appellant and David Stinson were "no longer living together ... she still was very fearful of this man, and believed that he was ... still after her.... She was still very, very fearful with respect to encountering David in or around the premises of her residence." Dr. Stone also testified that people with Post–Traumatic Stress Disorder often have a "heightened startle reflex," and they "over respond to ... sudden surprise events."

On the day of the shooting, March 16, 1996, the appellant's and David Stinson's then–16–year–old son Christopher had spent the night before at a friend's house, and the appellant met Christopher for lunch at the "Snack Hut." They stayed at the Snack Hut for a short while and then began to drive home. The appellant testified:

> ... [W]e started back home. When we started down over the hill [just before their driveway], a truck had come up, and then it stopped.... It was a red and white pickup ... when the truck had stopped, [the appellant and Christopher] backed out into the highway to let the truck pass, and Chris raised up and he said, "Oh, Mommy, God, that's Daddy. What does he want?" Chris got real hysterical....

The appellant and Christopher testified that the red and white pickup pulled out of the driveway near the appellant's trailer and sped down the road. The appellant testified that Christopher Stinson was "real, real upset, and he was cussing and he was going on, and I [the appellant] said, 'Well, I'll go get the gun and kill him [David Stinson] and get it over with. I can't take it anymore.' "

After the shooting, Christopher gave a statement to the police stating: "We come up Ritter Holler to kill my dad." The Appellant said in her statement given to police after the shooting, "I decided that if it was David at my house, I was going to kill him....We got the gun at the house and went to Ritter Hollow to look for David to kill him."

Uncertain that it was David Stinson in the truck, because David Stinson normally had a beard, Christopher called from a store "to ask my uncle if my father had shaved ... to confirm that it was my father." The uncle, Gary Pickens, responded to Christopher that his dad was "shaven." Christopher then, according to the appellant's evidence, said, "I told you it was Daddy, Mommy. It was that son of a bitch...." [4]

The appellant then drove home to get a gun. Christopher was still with her. Before entering her house, she said she "hesitated to go in." "I didn't know," she testified, "if it was going to blow when I opened the door. There was a Matney man that opened his door and just got blew up, and I kind of thought, 'Maybe,' but I just held my breath and said, 'I guess I'll go boom.' "

The appellant got a rifle that she kept "right beside my bed." She had obtained the gun from her mother some time prior to the day of the shooting. Her mother, the appellant said, didn't want to give her the gun, but the appellant claimed she insisted, "Mommy, what if I get killed tomorrow. What if I get killed tonight?"

The appellant and Christopher then drove to the home of Jimmy Crigger, a friend of David Stinson, and asked if David was there. Crigger said that he wasn't, but that he might be at a neighbor's. Crigger testified that the appellant did not appear to be upset or angry—nor did there appear to be anything unusual about her appearance or demeanor.

The appellant and Christopher then drove to Shirley Blevins' home, where they honked the car horn. Allen Blevins came outside to see what they wanted. The appellant asked

police who interviewed her after she was arrested for David Stinson's murder. The State notes that the appellant did not specifically corroborate Patricia Pickens' evidence that she had told the appellant about David Stinson's threats. However, the appellant did testify about her fears and actions that were based on those alleged threats, and Christopher also testified as to knowing of the threats.

4. The evidence at trial that David Stinson had actually been at the appellant's trailer was equivocal; however, Christopher testified that he had seen his father at the trailer.

if David Stinson was there. Allen said that David Stinson was there but that he was using the bathroom and would be a few minutes. Melissa Blevins Addair then came outside and told the appellant and Christopher to wait a minute, because David Stinson was using the bathroom. Melissa invited the appellant and Christopher inside for dinner, but they declined the offer. The appellant did not appear to be angry or upset.

The appellant then asked Melissa to tell David Stinson to go to the appellant's mother's residence, because the appellant wanted to speak to him. (The appellant's mother's residence was located very close to the Blevins'.)

At her trial, the appellant testified that despite her earlier statements of having an intent to kill David Stinson, by the time the appellant located him, she wanted merely to confront him about his being at her trailer— and to show him the rifle to warn him to stay away from her.

David Stinson had a gout condition which forced him to hobble and hop everywhere he went. When David Stinson finished in the bathroom, there was evidence that he said, "Well, probably, Chris or somebody like that is in trouble. Well, I will go and check on him."

Christopher testified that he and the appellant waited for several minutes after ascertaining that David Stinson was inside the Blevins' residence, and then pulled the car into the appellant's mother's driveway. Christopher remained in the car while the appellant, who had been driving, got out and walked around the car. She sat with Christopher or stood beside him with the door opened and the (loaded) rifle in her hand, for about 10 or 15 minutes.

The appellant testified that after waiting 5 or 10 minutes outside the car, and a few minutes inside the car, she told Christopher that she was going to walk to her mother's, and for him to pull the car up there. The appellant then sat back down in the car beside Christopher, with the rifle leaned against the door, and waited a few more minutes.

Then the appellant exited the car, putting the rifle in the car beside Christopher. She said to Christopher, " 'David couldn't hide up her [Shirley Blevins'] skirt tail forever,' and I started walking ." The appellant told Christopher, "I'm going to walk up on to her [the appellant's mother's] house."

As the appellant began her walk up the hollow, she heard shots:

Q. How many shots did you hear? Do you recall?

A. Just bam, bam. I don't have no ideal [sic]. I just turned around and I took off running and screaming. ·

Christopher told the jury that, as he and his mother waited for his father, the appellant said, "Well, I'll walk up to Granny's, and you go ahead and bring the car up there . . . ." As the appellant walked away, Christopher testified that he:

. . . backed the car out of the driveway, and as I seen my father come out the door of Shirley Blevins' I stepped out of the car, got the rifle and started shooting.

Christopher was thinking, "just seeing him and the previous beatings of my mother and me," he testified.

Shirley Blevins heard the shots and ran outside. She saw the appellant running back toward Christopher, crying and screaming. Shirley Blevins testified:

[Christopher] was standing there, and Penny came running down the road, . . . and she was crying and hollering and screaming . . . she [hugged Christopher] and [said], "Oh, God, my baby, Oh, God, my baby."

Gary Pickens did not hear the shots, but he looked out the window of his home and saw the appellant and Christopher embraced in the middle of the road. He told the jury that the appellant was screaming, "Oh, no, Christopher. Oh, no, Christopher." Gary Pickens said he heard Christopher, in response, tell his mother, "He will never hurt you, again. He will never hurt you, again."

The appellant and Christopher waited for the police to arrive at Gary and Patricia Pickens' trailer.

Trooper Brian Cochran was the first police officer on the scene. After making initial observations regarding the crime scene, he walked toward the Pickens' trailer. As he approached, he testified, the appellant and Christopher came "out of the back of the [Pickens'] residence and hollered at me." Trooper Cochran heard the appellant say, "We're the ones you are looking for."

Sergeant Ronald L. Blevins, of the Keystone Police Department, was the first officer to come into contact with the appellant. He testified that the appellant said it was her fault that the shooting occurred. Gary Pickens also heard her tell the police, "I did it. I did it. He didn't do it. I did it. I did it. You can take me to jail. I'm the one that shot David. I did it." Christopher put his arm around the appellant and said, "Well, mom, I was the one that shot him." The appellant then said, "Well, if you hadn't, I would have."

The appellant and her son were taken to the police station where they were questioned by Trooper Cochran and signed statements that Trooper Cochran had written out, based on his interrogations. They were both arrested for murder.

When asked whether his father ever beat him, Christopher said, "A little." When asked whether David Stinson had beaten him or physically abused him in recent years, Christopher said that he had not. He said that other than at the wake for his uncle, R.C. Stinson, a month and a half before the murder, he had not seen David Stinson for 6 months.

Trooper Cochran said that after Christopher was given Miranda warnings and arrested for murder, he was without reaction. Cochran stated that the appellant appeared to be a little upset that her son had shot David Stinson, but she expressed no remorse for David Stinson. The appellant stated, "It didn't bother me that David died, and it still doesn't bother me." She also stated, "David deserved to die. He was a man that shouldn't have lived. I'm not sorry he's dead. That's all I know to say."

### III.

We set forth the appropriate standards of review in our discussion of the various assignments of error.

### A.

*Insufficient Evidence*

The appellant argues that there was insufficient evidence to sustain her conviction of first degree murder as a principal in the second degree. This issue was preserved for appeal in the appellant's post-trial filing of a motion for a judgment of acquittal notwithstanding the verdict.

■ In Syllabus Point 3 of *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court stated the standard of review governing evidentiary sufficiency challenges in criminal cases:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

■ We have further stated, in Syllabus Points 5, 8, 10, 11, and 12 of *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989).

5. A person who is the absolute perpetrator of a crime is a principal in the first degree, and a person who is present, aiding and abetting the fact to be done, is a principal in the second degree.

8. Where a defendant is convicted of a particular substantive offense, the test of the sufficiency of the evidence to support

the conviction necessarily involves consideration of the traditional distinctions between parties to offenses. Thus, a person may be convicted of a crime so long as the evidence demonstrates that he acted as an accessory before the fact, as a principal in the second degree, or as a principal in the first degree in the commission of such offense.

10. Proof that the defendant was present at the time and place the crime was committed is a factor to be considered by the jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and his conduct before and after the commission of the crime.

11. Under the concerted action principle, a defendant who is present at the scene of a crime and, by acting with another, contributes to the criminal act, is criminally liable for such offense as if he were the sole perpetrator.

12. For a criminal defendant to claim that he withdrew from a criminal venture so as to avoid criminal responsibility, he must show that he disavowed the criminal purpose sufficiently in advance of the act to give his confederates a reasonable opportunity to withdraw, if they so desired, and did so in such a manner as to communicate to them his disapproval of or opposition to the criminal act.

■ In *State v. Harper*, 179 W.Va. 24, 29, 365 S.E.2d 69, 74 (1987), we stated:

It is well established that in order for a defendant to be convicted as an aider or abettor, and thus a principal in the second degree, the prosecution must demonstrate that he or she shared the criminal intent of the principal in the first degree. Of course, we also recognize that the defendant is not required to possess the identical intent as the principal in the first degree. Several courts have held that one who aids and abets in a homicide may be charged with and convicted of a greater or lesser degree offense than the principal in the first degree, depending on the mental state established at trial. [citations omitted.]

■ Applying the foregoing principles, given the appellant's physical presence at the commission of the homicide, and her many statements that she intended to kill David Stinson, we conclude that there was sufficient evidence to establish beyond a reasonable doubt the appellant's guilt as an aider and abettor and principal in the second degree.

■ The appellant also contends on appeal that if she had any intent to kill David Stinson, she had abandoned any such intent in a timely fashion, and that all of the evidence so showed. She notes that she laid the rifle down beside Christopher, told him to move the car, announced that she wanted to talk to David Stinson at her mother's house, and walked in that direction.

The appellant (in her brief) states:

Surely, this is an adequately expressed intention that she wanted Christopher to bring the car to his grandmother's house, where she would be waiting, unarmed, to talk to David. Surely, this is an adequately expressed intention that she did not want Christopher to wait by the Blevins' residence for his father to come out. Surely, this is an adequately expressed withdrawal from the criminal venture.

The State responds that assuming that these facts are true, they are insufficient to avoid criminal culpability as a matter of law as a principal in the second degree, under an abandonment or withdrawal defense. The State argues that once the jury had found that the appellant possessed the requisite criminal intent and had initiated a criminal enterprise, there was sufficient evidence for the jury to conclude that the appellant did not do everything practicable to abandon the enterprise.

The appellant argues that it is not realistic to expect her to have said specific "withdrawal" words to Christopher, such as, "I don't approve of shooting your father," or "Let's quit this criminal venture and do something else."

The State argues that the jury could have concluded that given the appellant's expressed intent, an effective withdrawal or abandonment would have required her either to deprive Christopher of the rifle or to drive

him away from David Stinson. We agree that the jury could have properly reached this conclusion.

For the foregoing reasons, we conclude that the appellant has not shown the insufficiency of the evidence to support her conviction as a principal in the second degree. Therefore, this assignment of error is without merit.

■ The appellant also contends that there was insufficient evidence of her having the requisite state of mind to show malice, so as to support her conviction of first-degree murder. This alleged error was also properly preserved by post-trial motion.

■ In Syllabus Point 1 of *State v. Evans,* 172 W.Va. 810, 310 S.E.2d 877 (1983), this Court stated:

> Whether malice exists in a particular case is usually a question for the jury, and although in perfectly clear cases, the courts have held that the evidence was not sufficient to show malice even where the jury had found to the contrary, yet malice is a subjective condition of mind, discoverable only by words and conduct, and the significance of the words and conduct of an accused person, whenever there can be doubt about such significance, addresses itself peculiarly to the considerations of the jury.

We conclude that there was sufficient evidence at trial for the jury to find that the defendant's actions met the legal standard for malice.

## B.

### Instructional Error

■ The second error that we address is the appellant's contention that the trial court erred in giving an instruction, over the appellant's objection, that omitted a *mens rea* requirement. The instruction read:

> If you find that the Defendant Penny Gail Miller acted independently of Christopher Stinson, and that after she left the scene, Christopher Stinson took the life of David Stinson of his own accord, without any influence, encouragement, aid, help or the like of the Defendant and that he, Christopher Stinson, in essence did the act of homicide, on his own, independent of the Defendant, then you should find the Defendant Penny Gail Miller not guilty.

The appellant's counsel objected to the failure of this instruction to include language regarding "shared criminal intent." However, it is unclear to us, as it was to the trial judge, how the concept of shared criminal intent would apply to this instruction. Moreover, there were other instructions that addressed the issue of shared criminal intent, that were not objected to by appellant's counsel. We do not believe that the circuit court committed reversible error in declining to add language regarding shared criminal intent to this instruction.

### Conclusion

For the foregoing reasons, we affirm the appellant's conviction.[5]

---

5. The appellant assigns several other errors that were not objected to at trial, nor were they otherwise properly preserved for appellate purposes. They are as follows:

(1) The appellant contends that the prosecutor capitalized on the confusing and contradictory jury instructions by arguing to the jury that there is no *mens rea* requirement for a conviction based on accomplice liability. This argument by the prosecutor was not objected to.

(2) The appellant contends that the trial court erred in not instructing the jury on the legal significance of the evidence that the appellant suffered from battered women's syndrome and Post–Traumatic Stress Disorder—and particularly, how the appellant's mental illness could reduce her criminal culpability, or negate or reduce her *mens rea*. However, defense counsel did not object to the trial court's failure to give such instructions.

(3) The appellant contends that the prosecutor made improper and unfairly prejudicial remarks during closing arguments: (a) by arguing facts not in evidence—that the appellant repeatedly said "Let's" get the gun, "Let's" go kill him, "Let's" go over to Ritter, "Let's" go back to the trailer—when there was no evidence that the appellant said any of these things; (b) by asking the jury to convict the appellant because otherwise Christopher would take the whole responsibility for killing his father; (c) by arguing to the jury that "heat of passion" is an element of voluntary manslaughter; and (d) by telling the jury that battered women's syndrome and Post–Traumatic Stress Disorder have nothing to do with this case. These remarks by the prosecutor were not objected to.

Affirmed.

Justice McGRAW did not participate in the decision of this case.

STARCHER, Justice, concurring:

I join the Court's *per curiam* opinion. I write separately for several reasons, but primarily to explain why I support this Court's decision not to consider whether the unpreserved errors asserted by Ms. Miller constitute reversible error under the discretionary "plain error" doctrine.[1]

I also want to briefly discuss several important issues that I think are involved in this case, and how those issues relate to further proceedings reviewing Ms. Miller's conviction and sentence.

I support the decision not to invoke the plain error doctrine because the asserted unpreserved errors are in large measure intertwined with the conduct of the trial by Ms. Miller's trial counsel, and this fact militates against reviewing them under the plain error doctrine in a direct appeal.

For example, the asserted unpreserved errors include several variations on the theme that Ms. Miller did not receive a fair trial because the jury was not meaningfully apprised of the significance of her Post-Traumatic Stress Disorder as it impacted the issue of Ms. Miller's state of mind. In other words, the jury was not instructed—nor did Ms. Miller's defense counsel argue to the jury—that Ms. Miller's Post-Traumatic Stress Disorder and resultant state of mind could reduce or negate Ms. Miller's criminal culpability.[2]

After reading the full record in this case, it is more than reasonable to conclude that Ms. Miller's ability to have a trial on the charges against her, in which her available defenses and mitigating circumstances were fully and effectively presented—that is, a fair trial—was substantially impaired by the failure of the jury to receive such instructions or argument about the possible legal significance of her mental disorder.

But what this Court cannot do, in the context of a direct appeal, is determine whether such an impairment occurred as the result of a deliberate and competent trial strategy assented to by Ms. Miller—or resulted from constitutionally insufficient, or "ineffective," assistance of counsel.[3]

There is an inherent difficulty in a direct appeal in assessing the merits of claims of

---

(4) The appellant contends that the other instructions used in the charge, when read as a whole: (a) do not adequately state the law as it applies to the facts; (b) confuse the burdens of proof and persuasion; (c) infringe upon the jury's fact finding role by assuming facts to be true; and (d) have serious potential to mislead the jury. These instructions were not objected to.

The *amici* agree with the foregoing allegations of error, and have added one of their own. The *amici* state that the circuit court erred in admitting, over objection, inflammatory statements by police officers that suggested that the appellant was having an incestuous relationship with her son Christopher.

Inasmuch as these alleged errors were not properly preserved for direct appellate review, or (in the case of the error asserted by the *amici* alone), asserted by the appellant on appeal, we may consider them only pursuant to the discretionary doctrine of "plain error." *State v. Miller*, 197 W.Va. 588, 597, 476 S.E.2d 535, 544 (1996), which we decline to invoke in the instant case.

1. The issue of the sufficiency of the evidence, to me, is a very close one, especially as to the "shared intent" and "abandonment" issues. But because the "sufficiency of the evidence" test is about as far in the province of the jury as one can get, I join in the Court's decision not to reverse on that ground.

2. In fact, Ms. Miller's counsel also did not discuss lesser included offenses with the jury, or suggest to the jury that Ms. Miller should receive a recommendation of mercy, in the event that the jury found her guilty of first degree murder. These issues are not raised on appeal, but could be raised in a habeas review.

3. Several obvious and facially meritorious arguments and defenses on behalf of Ms. Miller were not presented to the jury. Can a "capital" conviction obtained in such a situation ever be acceptable? Perhaps, when a reasonably sophisticated defendant consciously agrees to a deliberate trial strategy that involves foregoing such arguments and defenses. Was this the case for Ms. Miller? That remains to be seen.

It should be remembered that "ineffective assistance of counsel" does *not* mean that a lawyer is incompetent. Even the best lawyer's assistance can be "ineffective" in a given case. In a "capital" case like the instant one, the bar is set pretty high as to what constitutes a constitutionally fair trial.

error that raise questions about the constitutional sufficiency of a criminal defendant's legal representation. Therefore, such claims should ordinarily "be raised in a collateral proceeding rather than on direct appeal to promote development of a factual record sufficient for effective review." *State v. Miller*, 197 W.Va. 588, 611, 476 S.E.2d 535, 558 (1996).

For this reason, I join the Court's decision not to apply a "plain error" analysis to the unpreserved errors asserted by the appellant on direct appeal. These asserted errors should be addressed (along with any other issues that are raised) in a habeas corpus proceeding.

I also want to briefly discuss why the circumstances of the instant case require that there be an especially thorough and strict review of Penny Miller's conviction and sentence.

This is a case about domestic violence. There is no doubt that Penny Miller's conduct in connection with David Stinson's shooting flowed from David Stinson's domestic violence committed upon Penny Miller and their children for nearly 20 years.[4] "The

legal system's response to domestic violence is one of the most significant issues facing the judiciary in West Virginia." *State v. Wyatt*, 200 W.Va. 410, 416, 489 S.E.2d 792, 798 (1997) (Workman, J., dissenting).

Penny Miller was charged with first-degree murder for her involvement in the shooting of a man who by all of the undisputed evidence had criminally and savagely abused, beaten, oppressed, and terrorized Penny Miller for her entire adult life.[5]

What Penny Miller did in connection with David Stinson's shooting was wrong. But in reviewing how our law enforcement/criminal justice system responded to Penny Miller's conduct, we should also note how that system responded to David Stinson's horrible conduct.

Our criminal justice/law enforcement system, the record indicates, was fully aware of David Stinson's conduct (it was reported to the authorities on many occasions), but for a number of reasons that are not excuses, the system was ineffective in preventing David Stinson from engaging in an evil, violent criminal career of nearly 20 years' duration.[6]

4. Our society's understanding of what constitutes justice and responsibility has irretrievably abandoned the notion that David Stinson's criminal conduct was in any fashion Penny's "fault"—simply because she returned to the relationship after she was beaten.

We recognize that the promises, intimidation, threats, stalking, terrorism, degradation, and warping of normal human love and commitment that the abuser employs—and the continued lack of effective social controls and sanctions for people like David Stinson who commit domestic violence—belie and prohibit any ascribing of fault or blame for the domestic violence to its victims like Penny Miller.

Moreover, our legal system recognizes (although it was not effectively brought up at Penny Miller's trial) that an individual's criminal culpability may be diminished or negated as a result of the individual's prolonged brutalization by domestic violence. *See, e.g., State v. Lambert*, 173 W.Va. 60, 312 S.E.2d 31 (1984).

5. Ms. Miller has a below-average IQ and sixth grade reading skills. In a clinical assessment of Ms. Miller's psychological state by Dr. Stone, the forensic psychologist who testified at trial, in addition to the violence discussed in this Court's *per curiam* opinion, the following conduct by David Stinson was reported: Holding a gun to her head, forced anal intercourse and fellatio, restraining Penny from taking medicine, numer-

ous black eyes, a broken nose, dragging and shoving. Dr. Stone said that he believed that Ms. Miller, because of her PTSD, was acting in a self-protective mode in going to look for David Stinson with a gun.

6. To illustrate what this case is about, I want to pose a question and to suggest one answer to the question. The question is:

After nearly 20 years of repeatedly and knowingly committing violent crimes against innocent people—what really happened to David Stinson?

One answer to this question is as follows:

David Stinson's threats, curses, and rages—his backhands to Penny Miller's face, his fist punching her belly, his foot kicking her as she lay on the floor—Penny's puffy lips and swollen eyes, her cuts and bruises and bandages, her loose teeth and bleeding gums—the nights of terror for Christopher and Cheyenne, the curses and the blows landing on their mother—the lies, the insults, the broken promises—the fear, shame, isolation, failure, resignation and numbness—all of this, the fruits of David Stinson's abuse—*came home to roost* when David Stinson was shot to death by his own son.

One may wonder, as David Stinson lay bleeding to death on a trailer porch, did he have time to feel that he had finally been brought to account for his crimes—and by a person uniquely qualified to appreciate their gravity?

Simply put, our law enforcement/criminal justice system utterly failed Penny Miller and her son Christopher (and Cheyenne, too). Yet, that system now pursues and punishes Ms. Miller and her son Christopher because they struck back at their tormentor.

While one can easily take the "moral high ground" and say that violence is never justified and must be punished, that moral position was not implemented during the years that David Stinson was perpetrating his reign of terror against Penny Miller and her children. Do we have a "double standard" going on? And if so, what message does this double standard send to husbands and wives? I wonder, how far are we in the instant case from the O.J. Simpson case?

Most people want to build a society where justice is not a game and double standards are a thing of the past—where we can raise our children without being ashamed or cynical about our criminal justice system. Our court system must above all work toward these goals. To serve these goals in the instant case, the fundamental fairness of every aspect of Penny Miller's trial, conviction, and sentence—whether properly preserved for direct appellate review or not—must be given the most strict and searching review and assessment.

Because of the nature of this Court's ruling in the instant appeal, a full review and assessment of Ms. Miller's conviction and sentence have yet to occur.

Conducting such a review and assessment will be a challenge. Our legal system is fully capable of meeting such a challenge with courage, compassion, and common sense. In Penny Miller's case, this capability must become a reality.

In conclusion, I want to make three brief points.

First, the issues in the instant appeal were presented in a somewhat unusual fashion. The brief of the *amici* took an independent and thoughtful approach in criticizing Ms. Miller's conviction. However, as *amici*, they were limited in their ability to frame the issues. The *amici's* input would be invaluable in further proceedings in this case. Therefore, the circuit judge handling any habeas corpus petition by Ms. Miller should consult counsel for the *amici* before selecting appointed counsel to handle the petition.

Second, I think the State in good conscience should take a second look at the result that occurred in the instant case, in the light of conscience and fundamental fairness. If a habeas petition is filed, the State could agree to void Ms. Miller's conviction and to accept a plea to a lesser offense like voluntary manslaughter. Admittedly, our information in the record about Ms. Miller is incomplete, but I suspect that this result might be fair.[7]

Third, I simply state for the record that although the issue is not before this Court, I am also troubled by Christopher Stinson's second-degree murder conviction, especially if he was sentenced to an adult term of imprisonment for this offense, which would be 10 to 40 years.[8]

7. Taxpayer dollars are also an issue. There is no evidence that Ms. Miller poses any danger to the public at large. Isn't it somewhat wasteful and unnecessary for the State to feed, clothe, house, and treat her medically for the next 50 years, at an annual cost somewhere around that of a Harvard education?

8. Another matter that was not presented to the jury in Ms. Miller's trial, in evidence, instructions, or argument, was the effect of David Stinson's battering on Christopher Stinson and his state of mind. In Ms. Miller's case, this evidence should go to the issue of Ms. Miller's alleged "shared criminal intent" with her son.

The *amici* point out that the "battered child syndrome" has come to describe both the physiological and psychological effects of a prolonged pattern of physical, emotional and sexual abuse.

*See generally* Steven R. Hicks, *Admissibility of Expert Testimony on the Psychology of the Battered Child,* 11 L. & Psychol.Rev. 103, 108–11 (1987). Such abuse typically lasts over a significant period of time and tends to operate in recurring patterns. *Id.* Victims of chronic abuse often suffer from Post–Traumatic Stress Disorder. As in the battered woman syndrome, hypervigilance, or what may seem to an outsider to be a paranoid or irrational perception of danger, is a characteristic of the battered child syndrome. Paul A. Mones, *When a Child Kills: Abused Children Who Kill Their Parents* 63 (1991). Shelly Post, in *Adolescent Parricide in Abusive Families,* 51 Child Welfare No. 7, 445 (1982), observed that an abused child who kills a parent has generally witnessed that parent use violence and threats against other family members. *Id.* at 449. The helplessness of these children is exac-

For the foregoing reasons, I respectfully concur.

erbated by the apparent lack of successful intervention by others, including the police and the courts, and this makes children place the burden on themselves to deal with the parental violence. *Id.* at 453. *See also* Diana J. Ensign, Note, *Links Between the Battered Woman Syndrome and the Battered Child Syndrome: An Argument for Consistent Standards in the Admissibility of Expert Testimony in Family Abuse Cases*, 36 Wayne L.Rev. 1619 (1990).

The *amici* argue that Ms. Miller, suffering from PTSD herself, did not deliberately manipulate or encourage Christopher to kill his father—and that ultimately Christopher shot David Stinson as a result of Christopher's own disordered psychological state—to protect Ms. Miller, his mother. "He will never hurt you again."