650 S.E.2d 216

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Valerie WHITTAKER, Defendant Below, Appellant.**

**No. 33037.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 14, 2007.

Decided April 5, 2007.

Dissenting Opinion of Justice Albright May 15, 2007.

Dissenting Opinion of Justice Starcher June 11, 2007.

Concurring Opinion of Justice Maynard June 29, 2007.

David C. Smith, Smith & Scantlebury, L.C., Ward Morgan, Bluefield, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Colleen A. Ford, Assistant Attorney General, Dawn E. Warfield, Deputy Attorney General, Charleston, for the Appellee.

PER CURIAM:

The appellant herein and defendant below, Valerie Whittaker [hereinafter "Ms. Whittaker"], appeals from the January 14, 2005, order of the Circuit Court of Mercer County rendered after a jury adjudged Ms. Whittaker guilty of voluntary manslaughter in the death of her longtime boyfriend. In its order, the court adopted the jury's determination of guilt and sentenced Ms. Whittaker to a determinate term of ten years imprisonment. On appeal to this Court, Ms. Whittaker contends that the trial court erred by (1) not entering a judgment of acquittal[1] based upon her claim of self-defense; (2) limiting the testimony of various defense witnesses; (3) refusing to admit certain evidence proffered by Ms. Whittaker; and (4) admitting statements made by Ms. Whittaker. Upon a review of the parties' arguments, the record presented for our consideration, and the pertinent authorities, we affirm Ms. Whittaker's conviction.

## I.

### FACTUAL AND PROCEDURAL HISTORY

At the time of the events relevant to this appeal, Valerie Whittaker and Jerry Calvin Mills, Jr. [hereinafter "Mr. Mills"], had been dating for approximately ten years and had one child together, J.W.[2] Throughout the parties' relationship, Ms. Whittaker frequently sought shelter for herself and her daughter at a local battered women's shelter, her pastor's home, and her aunt's house in order to escape from Mr. Mills' physical and emotional abuse.[3] During this time, Ms. Whittaker obtained four separate domestic violence petitions against Mr. Mills in an effort to protect her daughter and herself; three of these protective orders were never served on

---

1. See note 14, infra.

2. J.W. was nine years old at the time of the incidents at issue herein. Due to the tender age of the child involved in this case, we will continue our practice in similar cases and refer to her by her initials rather than by her full name. See, e.g., Wilson v. Bernet, 218 W.Va. 628, 629 n. 3, 625 S.E.2d 706, 707 n. 3 (2005); In re Clifford

K., 217 W.Va. 625, 630 n. 1, 619 S.E.2d 138, 143 n. 1 (2005).

3. The severity and duration of the abuse inflicted by Mr. Mills upon Ms. Whittaker and J.W. included hitting, yelling, threats of death and bodily harm, throwing them across the floor, torturing and eventually killing J.W.'s pet cat and pet rooster in front of her, and stalking.

Mr. Mills, including the one pending at the time of his death.[4]

The events leading up to the death of Mr. Mills began in the spring of 2003. In an effort to terminate their relationship, Ms. Whittaker purchased a mobile home and moved it to property adjoining the residence of her parents. Nevertheless, Mr. Mills left his home in Princeton and moved into Ms. Whittaker's home with her and their daughter. Ultimately, Ms. Whittaker and J.W., apparently fearing Mr. Mills, left this residence and temporarily resided at Princeton Community Hospital where security guards could protect them twenty-four hours a day. Upon learning of their continued presence, hospital personnel directed Ms. Whittaker and J.W. to a local women's shelter, where they stayed for approximately five days.[5] During this time, the Mercer County Sheriff's Department unsuccessfully attempted to serve Mr. Mills with Ms. Whittaker's latest domestic violence petition. Nevertheless, Mr. Mills was made aware of the petition's existence when Ms. Whittaker called Mr. Mills' friend, James Duncan [hereinafter "Mr. Duncan"], and asked his wife, Carolyn, to inform Mr. Mills of the petition.[6]

Thereafter, Ms. Whittaker and J.W. left the shelter and went to Ms. Whittaker's aunt's home, where they stayed for a few days. On June 25, 2003, Ms. Whittaker, with J.W., traveled to Princeton to keep a scheduled doctor's appointment. Upon leaving the doctor's office building, they encountered Mr. Mills in the parking lot, where he was waiting for them and allegedly threatened them. Driving in two separate vehicles, Ms. Whittaker, with J.W., and Mr. Mills then drove to a nearby pharmacy to have prescriptions filled, to a gas station, and back to Ms. Whittaker's mobile home. From there, they left in one vehicle to go to Mr. Duncan's house to retrieve an item, where they stayed and visited for some time. Afterwards, Mr. Mills, Ms. Whittaker, and J.W. traveled to a convenience store and returned to Ms. Whittaker's home, at which time Mr. Mills began threatening to kill both Ms. Whittaker and J.W. Once inside the home, Mr. Mills picked up J.W. by her hair and her shirt and, as recounted by Ms. Whittaker, "rolled her . . . across the floor like [a] bowlin[g] ball." Apparently afraid of Mr. Mills' next actions, Ms. Whittaker retrieved Mr. Mills' .38 caliber revolver from a kitchen cabinet and shot him one time, instantly killing him. At the time of the shooting, Ms. Whittaker was approximately seventeen feet away from Mr. Mills.[7]

Immediately following the shooting, Ms. Whittaker, seemingly in a state of panic, placed a shotgun in Mr. Mills' hand to bolster her claim of self-defense.[8] She then called the West Virginia State Police to report her actions. Because they could not locate her house, the State Police asked Ms. Whittaker

4. Ms. Whittaker first obtained a temporary protective order against Mr. Mills on January 12, 1995; this petition was dismissed without prejudice due to Ms. Whittaker's request on January 17, 1995, that it be dismissed. On February 19, 1997, a second temporary protective order was issued to Ms. Whittaker against Mr. Mills; a final ninety-day protective order was issued on February 21, 1997, which was the only protective order, final or temporary, that was actually served on Mr. Mills. Again, on October 14, 1997, Ms. Whittaker obtained a temporary protective order; however, this matter was dismissed on October 20, 1997, due to Ms. Whittaker's failure to appear at the final hearing thereon. The most recent temporary protective order was issued to Ms. Whittaker on June 18, 2003; the June 24, 2003, hearing was continued to July 1, 2003, on which date the protective order was terminated due to Ms. Whittaker having killed Mr. Mills.

5. Ms. Whittaker and J.W. had stayed at this shelter on numerous prior occasions; the length of their stays ranged from two days to three months.

6. Apparently, Ms. Whittaker believed that her repeated domestic violence petitions against Mr. Mills charging him with threatening to harm her with various deadly weapons placed him in jeopardy of losing his hunting license, and she asked Carolyn to relay this information to Mr. Mills as well. *See* W. Va.Code § 20–2–38 (1969) (Repl. Vol.2002) (revoking hunting license for conviction under W. Va.Code § 61–7–11); W. Va.Code § 61–7–11 (1994) (Repl.Vol.2000) (establishing crime of brandishing deadly weapon and imposing penalties therefor).

7. Testing of Mr. Mills' blood following his fatal wound revealed concentrations of alcohol, hydrocodone, and Valium.

8. Whether Ms. Whittaker and J.W. discussed placing the gun in Mr. Mills' hand is disputed by the record evidence.

to meet them at a local landmark. She then gave four statements to investigating officers: (1) in the state police car while she was being driven from the landmark back to her house, which statement was not recorded; (2) at her trailer, which statement was tape recorded; (3) at the state police barracks, which statement was not recorded and of which no notes were taken; and (4) in the state police car while she was being transported for arraignment before a magistrate in Princeton, which statement was not recorded.

The Mercer County grand jury returned an indictment on February 11, 2004, charging Ms. Whittaker with first degree murder.[9] At the conclusion of her jury trial on September 3, 2004, the jury found Ms. Whittaker to be guilty of voluntary manslaughter.[10] The trial court, by order entered January 14, 2005, then adopted the jury's finding of guilt and sentenced Ms. Whittaker to a determinate term of ten years[11] imprisonment in the state penitentiary.[12] This appeal follows.[13]

## II.

### STANDARD OF REVIEW

■■■■ In this case, we are asked to reverse the jury's verdict finding Ms. Whittaker guilty of voluntary manslaughter. The burden Ms. Whittaker must bear to secure the reversal of her conviction is a heavy one. We previously have held that "a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). With particular relevance to the instant appeal, we also have held that "[i]t is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence." Syl. pt. 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927). In arguing that her conviction should be reversed, Ms. Whittaker identifies many rulings of the trial court which she claims were erroneous. Because these alleged errors are considered under different standards of review, we will discuss these more specific standards in connection with the issues to which they pertain.

## III.

### DISCUSSION

On appeal to this Court, Ms. Whittaker assigns numerous errors to the circuit court's

---

9. W. Va.Code § 61–2–1 (1991) (Repl.Vol.2000) defines first-degree murder as follows:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.
>
> In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

The penalty for first degree murder is "confinement in the penitentiary for life." W. Va.Code § 61–2–2 (1965) (Repl.Vol.2000).

10. "Voluntary manslaughter" is discussed in W. Va.Code § 61–2–4 (1994) (Repl.Vol.2000) as follows:

> Voluntary manslaughter shall be punished by a definite term of imprisonment in the penitentiary which is not less than three nor more than fifteen years. A person imprisoned pursuant to the provisions of this section is not eligible for parole prior to having served a minimum of three years of his or her sentence or the minimum period required by the provisions of section thirteen [§ 62–12–13], article twelve, chapter sixty-two, whichever is greater.

See Section III.A.2., *infra*, for further discussion of the elements of voluntary manslaughter.

11. *See* note 10, *supra*.

12. Ms. Whittaker received credit for the 524 days she previously had served for this crime. Although she requested to be released on postconviction bond pending her appeal to this Court, the circuit court denied this request. The court did, however, order that Ms. Whittaker be placed in the Southern Regional Jail rather than in the state penitentiary while this Court is considering her appeal.

13. During oral argument before this Court, counsel for Ms. Whittaker represented that she was released on parole on February 9, 2007.

entry of judgment and sentence against her: (1) the trial court failed to enter a judgment of acquittal based upon her claim of self-defense; (2) the trial court limited the testimony of various defense witnesses; (3) the trial court refused to admit certain evidence proffered by Ms. Whittaker; and (4) the trial court erred by admitting Ms. Whittaker's prior statements to police officers. We will address each of these assignments in turn.

### A. Failure to Enter Judgment of Acquittal Based upon Self–Defense

■ Ms. Whittaker first assigns error to the trial court's refusal to enter a judgment of acquittal based upon her claim of self-defense. In presenting her argument on this point, however, Ms. Whittaker actually raises two distinct issues: (1) whether the evidence was sufficient to support her motion for a directed verdict [14] and (2) whether the evidence was sufficient to support her conviction and resultant sentence. We will separately consider these issues.

**1. Sufficiency of evidence to support motion for judgment of acquittal.** Ms. Whittaker's first contention is that the State's evidence was not sufficient to disprove that she had acted in self-defense and that the trial court thus improperly refused her motion for judgment of acquittal at the close of the State's case-in-chief. In this regard, she asserts that the weight of the evidence overwhelmingly supports her claim that she acted in self-defense when she shot and killed Mr. Mills. The State replies that the evidence was sufficient to support Ms. Whittaker's conviction and proved her guilt beyond a reasonable doubt. In refusing to enter a judgment of acquittal in Ms. Whittaker's favor, the trial court ruled that

> [l]ooking at the evidence most favorable to the State, I believe that the State has established a prima facie case of murder in the first degree and all the lesser included offenses under that, so the Court will deny

the motion for a directed verdict of a judgment of acquittal.

■ When reviewing a lower court's refusal to direct a verdict, this Court is bound to consider the evidence in the light most favorable to the prosecution to determine whether a verdict of acquittal should have been directed for the defendant.

> " ' "Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West,* 153 W.Va. 325, 168 S.E.2d 716 (1969).' Syl. pt. 1, *State v. Fischer,* 158 W.Va. 72, 211 S.E.2d 666 (1974)." Syl. Pt. 10, *State v. Davis,* 176 W.Va. 454, 345 S.E.2d 549 (1986).

Syl. pt. 1, *State v. Rogers,* 209 W.Va. 348, 547 S.E.2d 910 (2001). In this case, we must consider whether the evidence was sufficient to support Ms. Whittaker's conviction at the time she moved for judgment of acquittal at the close of the State's case.

Despite Ms. Whittaker's claim that she shot Mr. Mills in self-defense, a review of the trial transcript demonstrates that the State presented evidence sufficient to deny Ms. Whittaker's motion for judgment of acquittal. During its case-in-chief, the State presented the testimony of nine witnesses. Through these witnesses, the State presented evidence that Ms. Whittaker did not have a gun on her person at the time of the shooting but that she knew where Mr. Mills kept one in the kitchen of her trailer. The State also proved that Ms. Whittaker shot Mr. Mills and killed him from seventeen feet away with a single gunshot wound between his eyes, despite her claim that she had never before fired the gun used in the shooting. Further-

---

**14.** In her brief, Ms. Whittaker repeatedly refers to her "motion for a directed verdict"; however, Rule 29(a) of the West Virginia Rules of Criminal Procedure abolished this phrase and replaced it with "motions for judgment of acquittal." *See* W. Va. R.Crim. P. 29(a) ("Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place."). To maintain consistency with the current state of the law, we will thus refer to Ms. Whittaker's motion as one for a judgment of acquittal.

more, the State presented evidence that, after the shooting but before she called to report Mr. Mills' death, Ms. Whittaker placed a shotgun in Mr. Mills' hand presumably to bolster her claim of self-defense. The State further demonstrated that, in order to retrieve and plant the shotgun in Mr. Mills' hand, Ms. Whittaker had to step through Mr. Mills' blood and that, in doing so, she left bloody footprints around his body. Finally, the State introduced into evidence Ms. Whittaker's numerous statements to law enforcement officials which provided contradictory accounts of the shooting. We believe this evidence was sufficient to deny Ms. Whittaker's motion for judgment of acquittal.

■■■ **2. Sufficiency of evidence to support voluntary manslaughter conviction.** Ms. Whittaker additionally argues that the evidence was insufficient to sustain her conviction. On this point, Ms. Whittaker appears to argue that the State failed to prove beyond a reasonable doubt that she did not act in self-defense. Such an argument necessarily requires us to consider whether the evidence was sufficient to permit the jury to find Ms. Whittaker guilty beyond a reasonable doubt.

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). In other words,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. . . .

Syl. pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163.

■■■ Ms. Whittaker bases her argument that the evidence was insufficient to support her conviction on her claim of self-defense. This Court previously set forth the elements of self-defense in *State v. Cain*, 20 W.Va. 679 (1882):

When one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.

Syl. pt. 7, *id.* In any event, however, imminency of the danger apprehended is a crucial component of self-defense: "Under his plea of self-defense, the burden of showing the imminency of the danger rests upon the defendant. No apprehension of danger previously entertained will justify the commission of the homicide; it must be an apprehension

existing at the time the defendant fired the fatal shot." Syl. pt. 6, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927). "Once there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." Syl. pt. 4, *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978).

 In this case, the State originally had charged Ms. Whittaker with first-degree murder.[15] Upon the conclusion of the trial, however, the jury concluded that Ms. Whittaker was guilty of the lesser-included offense of voluntary manslaughter. The absence of malice distinguishes the crime of voluntary manslaughter from the crime of murder. "Malice, express or implied, is an essential element of murder . . ., and if absent the homicide is of no higher grade than voluntary manslaughter." *State v. Jones*, 128 W.Va. 496, 499, 37 S.E.2d 103, 105 (1946) (citations omitted), *overruled on other grounds by Proudfoot v. Dan's Marine Serv., Inc.*, 210 W.Va. 498, 558 S.E.2d 298 (2001). *Accord State v. Kirtley*, 162 W.Va. at 254, 252 S.E.2d at 376–77 ("It is the element of malice which forms the critical distinction between murder and voluntary manslaughter." (citation omitted)). Thus, manslaughter has been described as " '[a] sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a gross provocation, is *prima facie* a killing in heat of blood, and, therefore, an offense of no higher degree than voluntary manslaughter.' Point 10, syllabus, *State v. Clifford*, 59 W.Va. 1[, 52 S.E. 981 (1906) ]." Syl. pt. 3, *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243 (1957).

Although the events leading up to Mr. Mills' death could suggest that Ms. Whittaker was acting in self-defense [16] as she claims, the evidence presented a question as to whether Ms. Whittaker "apprehend[ed] . . . danger," Syl. pt. 6, in part, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732, at the time she shot Mr. Mills insofar as she admitted

that Mr. Mills did not have a gun in his hand at that moment and that she later placed one in his hand to bolster her self-defense claim. The evidence presented by the State could also be construed as indicating a premeditated intent to kill Mr. Mills, as " '[a] sudden intentional killing with a deadly weapon, by one who is not in any way at fault, in immediate resentment of a gross provocation,' " Syl. pt. 3, in part, *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243. Simply stated, the jury could have accorded the State's evidence numerous interpretations. For example, one view is that Ms. Whittaker shot Mr. Mills in self-defense, panicked after the shooting, and placed a gun in Mr. Mills' hand because she felt guilty and afraid. By contrast, the evidence could be viewed as showing that Ms. Whittaker was not really acting in self-defense, was not remorseful for her actions when she tracked Mr. Mills' blood through her trailer, and that she placed a gun in his hand because she needed to create a believable claim of self-defense.

██ In any event, determinations as to the credibility of witnesses are matters for the jury to resolve, not matters to be decided by either the trial court or this Court. Syl. pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163. Also within the province of the jury is the question of whether the defendant acted in self-defense. *See* Syl. pt. 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732. Upon the evidence presented, we are convinced that "there [wa]s substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt," Syl. pt. 1, in part, *State v. Rogers*, 209 W.Va. 348, 547 S.E.2d 910, and that the verdict of the jury adverse to Ms. Whittaker's claim of self-defense was not "manifestly against the weight of the evidence." Syl. pt. 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732. Thus, in this case, we find the evidence was sufficient to prove beyond a reasonable doubt that Ms. Whittaker did not act in self-defense.

---

**15.** *See supra* note 9.

**16.** We do not address whether the evidence supported a claim of defense of others vis-a-vis her

daughter insofar as Ms. Whittaker based her motion for a judgment of acquittal upon her claim of self-defense.

## B. Evidentiary Rulings

 Ms. Whittaker also assigns error to several evidentiary rulings made by the trial court, namely the trial court's decision to limit the testimony of certain defense witnesses; the trial court's refusal to admit certain items into evidence; and the trial court's admission into evidence of prior statements she had made to law enforcement officials. When reviewing the decision of a trial court concerning the admission or refusal to admit evidence, we accord the trial court broad discretion and consider whether the trial court abused that discretion in rendering its ruling.

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994).

Syl. pt. 2, *State v. Doonan,* 220 W.Va. 8, 640 S.E.2d 71 (2006). *Accord* Syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983) (" 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk,* [171] W. Va. [639, 643], 301 S.E.2d 596, 599 (1983) [ (citations omitted), *overruling on other grounds recognized by State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995) ]."). Thus, we will consider whether the trial court abused its discretion in making the evidentiary rulings of which Ms. Whittaker now complains.

**1. Limitations on defense witnesses' testimony.** With respect to the trial court's evidentiary rulings, Ms. Whittaker first argues that the trial court erred by limiting the testimony of various defense witnesses: Ermajean Hudgins, Sandra Brinkley, and Debra Fowler. Because the trial court precluded these witnesses from testifying about statements she had made to them, Ms. Whittaker contends that she was not able to fully develop her claim of self-defense because she was not able, through these witnesses, to demonstrate the full extent of abuse she had suffered while living with Mr. Mills. The State responds that the trial court did not err by limiting the testimony proffered by these witnesses because the precluded testimony was inadmissible hearsay.

When this Court is asked to review a trial court's rulings on the admissibility of evidence, as well as the trial court's application of evidentiary rules, we accord the trial court great deference and will reverse such rulings only if the trial court has abused its discretion. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998). *Cf.* Syl. pt. 1, *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995) ("An interpretation of the West Virginia Rules of Evidence presents a question of law subject to *de novo* review.").

 The issue presented by this assignment of error concerns hearsay. "Hearsay" is defined by Rule 801 of the W. Va. Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, hearsay is not admissible. W. Va. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules."). However, hearsay may be admissible if it comes within one of the recognized exceptions. *See* W. Va. R. Evid. 803 (recognizing exceptions to hearsay as including, among others, present sense impression; excited utterance; then existing mental, emotional, or physical condition; and statements for purposes of medical diagnosis or treatment). *See also* W. Va. R. Evid. 804 (citing additional exceptions to hearsay rule when declarant is unavailable). In other words,

[g]enerally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the

statement is hearsay but falls within an exception provided for in the rules.

Syl. pt. 1, *State v. Maynard,* 183 W.Va. 1, 393 S.E.2d 221 (1990). Thus, we must determine whether the trial court properly limited the testimony of the three witnesses to which Ms. Whittaker assigns error.

*(a) Ermajean Hudgins.* During her trial, Ms. Whittaker called Ermajean Hudgins [hereinafter "Ms. Hudgins"] as a witness on her behalf. On approximately five occasions in the two years before Mr. Mills' death, Ms. Whittaker and her daughter had sought refuge at the New Life Tabernacle Church, where Ms. Hudgins serves as a pastor. Ms. Hudgins was permitted to testify freely about the physical appearance and demeanor of Ms. Whittaker on these occasions, how fearful Ms. Whittaker was when she sought shelter, and how Ms. Hudgins had offered assistance to Ms. Whittaker and her daughter. The only testimony objected to by the State was Ms. Hudgins' testimony as to what Ms. Whittaker specifically had told her on those occasions; the trial court excluded such testimony, determining such statements to be inadmissible hearsay. Ms. Whittaker contends, however, that these statements were admissible as original evidence or to show her then-existing state of mind. We disagree.

■ Ms. Whittaker claims that Ms. Hudgins should have been permitted to testify as to the statements she made to Ms. Hudgins regarding Mr. Mills' threats and abuse to show not the truth of the matter asserted but rather to show her state of mind at the time she sought shelter. While on the surface this argument seems to make perfect sense, in actuality this argument is inconsistent with Ms. Whittaker's claim of self-defense. In order to prove that she shot Mr. Mills in self-defense, Ms. Whittaker would also need to establish that she had had an abusive relationship with Mr. Mills in which he was the aggressor. Insofar as Ms. Hudgins was permitted to testify as to Ms. Whittaker's fearful state of mind and her physical appearance regarding the presence or absence of bruises

or other marks indicative of abuse, the only purpose which Ms. Hudgins' excluded statements could have served would have been to prove the truth of the matter asserted: that Ms. Whittaker had been abused and that Mr. Mills was the abuser.

■ Neither do we agree with Ms. Whittaker's characterization of the excluded statements as constituting original evidence. The concept of "original evidence" typically contemplates that "conversation[s] contemporaneous with the facts in controversy and explaining such fact[s] are admissible.... But they must be so connected with the main fact under consideration as to illustrate its character, to further its object, or to form in conjunction with it one continuous transaction." *Sample v. Consolidated Light & Ry. Co.,* 50 W.Va. 472, 478, 40 S.E. 597, 600 (1901) (internal quotations and citations omitted), *reh'g denied,* 50 W.Va. 472, 40 S.E. 694 (1902). Here, the fact in controversy, *i.e.* whether Ms. Whittaker acted in self-defense when she shot and killed Mr. Mills on June 25, 2003, is simply too remote in time from the few occasions on which Ms. Whittaker sought shelter at Ms. Hudgins' church, the dates of which Ms. Hudgins could not recall, to render Ms. Whittaker's statements on those occasions admissible as original evidence. Because the excluded statements do not satisfy any exceptions to the hearsay rule, the trial court properly limited Ms. Hudgins' testimony.

*(b) Sandra Brinkley and Debra Fowler.* During Ms. Whittaker's case-in-chief, the trial court sustained objections by the State which precluded several defense witnesses, including Ms. Hudgins, from testifying about statements Ms. Whittaker had made to them regarding her abuse by Mr. Mills. Before calling additional defense witnesses, counsel for Ms. Whittaker proffered the testimony of her aunts, Sandra Brinkley [hereinafter "Ms. Brinkley"] and Debra Fowler [hereinafter "Ms. Fowler"], to the trial court *in camera* to preserve their · testimony for appellate review.[17] Following their testimony, the trial court stated that "the Court will continue to

---

**17.** After Ms. Brinkley and Ms. Fowler had testified *in camera,* the trial court instructed them each to return to the courtroom the following

morning, apparently presuming that Ms. Whittaker would call them both as witnesses at trial.

rule that hearsay will not be permitted by either side in the case."

■ On appeal, Ms. Whittaker complains that the trial court erred by limiting the testimony of both of these witnesses. While the trial court did rule that it would not permit Ms. Whittaker's aunts to testify about hearsay statements she had made to them, it did not entirely preclude these witnesses from testifying. Nevertheless, Ms. Whittaker did not call Ms. Brinkley as a witness to testify at trial before the jury. Because Ms. Brinkley was not called to testify, her testimony was neither objected to by the State nor limited by the trial court. Accordingly, we find this assignment of error as it relates to Ms. Brinkley's testimony to be without merit.

■ Ms. Whittaker did, however, call Ms. Fowler as a witness during her case-in-chief. Ms. Fowler was permitted to testify about providing shelter to Ms. Whittaker and J.W. during the days immediately preceding the shooting and her personal observations that Ms. Whittaker was nervous and afraid of Mr. Mills. She was not permitted to testify, though, as to any statements Ms. Whittaker had made to her. Although Ms. Whittaker contends that the excluded testimony should have been allowed as an exception to the hearsay rule, we conclude that the excluded testimony of Ms. Fowler, like that of Ms. Hudgins, does not qualify as an exception to inadmissible hearsay. Any statements Ms. Whittaker made to Ms. Fowler were either on June 25th, the day of Mr. Mills' death, or on the days leading up to that date. Given the lapse of time between Ms. Whittaker's departure from Ms. Fowler's home in the late morning hours of June 25, 2003, and her shooting of Mr. Mills later that evening, Ms. Whittaker's statements to Ms. Fowler are simply too remote in time to be relevant as evidence of her state of mind at the time of Mr. Mills' death or as evidence as to whether, at the precise moment of the shooting, she was acting in self-defense. Because the trial court limited Ms. Fowler's testimony to exclude these inadmissible hearsay statements, we find no error with the trial court's ruling in this regard.

**2. Limited admissibility of cock fighting paraphernalia.** Next, Ms. Whittaker argues that the trial court erred by not allowing Mr. Mills' cock fighting paraphernalia into evidence. Ms. Whittaker asserts that she wished to introduce this evidence to demonstrate Mr. Mills' cruelty, but that "[t]he trial court permitted [it] to be exhibited to the jury but not introduced into evidence." The State responds that the trial court did, in fact, admit this evidence but denominated it as demonstrative evidence that would not be given to the jury. After reviewing the trial transcript, we find the State's representations to be a more accurate recitation of the trial court's rulings on this evidence.

During the course of Ms. Whittaker's testimony, her counsel asked her to identify a blue plastic box that belonged to Mr. Mills and contained paraphernalia he used to prepare his birds for cock fighting, including bladed spurs, syringes, and medications for "doping" the birds. Thereafter, counsel for Ms. Whittaker moved for the introduction of this evidence, which the trial court allowed. The trial court ruled, however, that this evidence would not be permitted to go to the jury.

BY: Mr. Smith [counsel for Ms. Whittaker]

Q So he [Mr. Mills] was into chicken hunting?

A Chicken-cock fighting, yes sir.

MR. SMITH: Mark that?

**(Defendant's Exhibit No. 3, Blue Plastic Box with cock fighting paraphernalia, marked for identification.)**

Q Do you recognize what's been marked Defendant's Exhibit No. 3?

A That is one of the boxes that he would always take with him whenever he went to a cock fight to prepare his chickens for the fight, what he would use.

Q Are you familiar with the contents of this box?

A Pretty much, not exactly but pretty much.

Q What are those?

A Those are spurs, those are cock spurs, they cut their regular spurs off, they saw them down as close to the chicken as they

can-their feet so that those will fit on, and then they have to take string and tape, and all, and then put-slip that down on it and tape it on there, and there may be blades in there but that is the spurs that goes one on each foot.

MR. BOGGESS [counsel for the State]: Again I'm gonna object as to relevancy, Your Honor, I-

THE COURT: What is the relevance here, Mr. Smith?

MR. SMITH: Your Honor, it's a blood sport and I think I'm entitled to show the deceased was into what amounts to illegal blood sports, I think it goes to her knowledge of his-what he was capable of.

THE COURT: I'll leave that up to the jury so I'll overrule the objection.

BY: Mr. Smith

Q These were his, right?

A Yes.

MR. SMITH: At this time I'd move the introduction of Defendant's Exhibit No. 3?

THE COURT: Any objection?

MR. BOGGESS: Only as to relevancy, Your Honor.

THE COURT: Well since it's-I'm not sending all that back to the jury,-

MR. SMITH: Sure.

THE COURT: -the jury's seen this so I'm not gonna allow that-

MR. SMITH: Okay.

THE COURT: -as an Exhibit to go back to them. You're not offering those trophies, or anything like that at this point?

MR. SMITH: No, Your Honor.

THE COURT: Thank you.

**(Defendant's Exhibit No. 3, Blue Plastic Box with cock fighting paraphernalia, introduced into evidence but not to go to jury.)**

MR. SMITH: Those were demonstrative.

■ On appeal, counsel for Ms. Whittaker suggests that the trial court did not allow this evidence to be introduced, and he also seeks to challenge the trial court's rulings in this regard. The problem with this assignment of error is twofold. First, that of which Ms. Whittaker complains is not what actually occurred at trial as reflected by the trial transcript. Contrary to her assertions, the trial court did admit Mr. Mills' cock fighting paraphernalia into evidence. Accordingly, her assertion that the trial court did not admit these items into evidence is without merit.

■ Additionally, Ms. Whittaker attempts to complain about the trial court's ruling whereby it permitted the jury to see the evidence during trial but prohibited it from being sent to the jury during their deliberations. However, during the trial discourse regarding this evidence, counsel for Ms. Whittaker did not object to the limited purpose for which the trial court admitted this evidence and, in fact, specifically acquiesced in the trial court's ruling in this regard.

■ Ordinarily, a party must raise his or her objection contemporaneously with the trial court's ruling to which it relates or be forever barred from asserting that that ruling was in error.[18]

When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course

---

18. The "raise or waive" rule is not absolute where, in extraordinary circumstances, the failure to object constitutes plain error. "The 'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." *State v. Miller*, 194 W.Va. 3, 18, 459 S.E.2d 114, 129 (1995). "Under plain error, appellate courts will notice unpreserved errors in the most egregious circumstances. Even then, errors not seasonably brought to the attention of the trial court will justify appellate intervention only where substantial rights are affected." *State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996). Where, however, "there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined." Syl. pt. 8, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114. The failure of counsel to object to the trial court's ruling in the case *sub judice* does not necessitate a plain error analysis insofar as counsel not only failed to object to, but affirmatively agreed with, the trial court's decision.

of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*State v. LaRock,* 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996). Thus,

[t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a [trial] court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the [trial] court on pain that, if they forget their lines, they will likely be bound forever to hold their peace . . . .

*State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) (citations omitted). *Accord State v. Miller,* 194 W.Va. 3, 17, 459 S.E.2d 114, 128 (1995) (" 'One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result' in the imposition of a procedural bar to an appeal of that issue." (quoting *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir.1994) (en banc))).

Here, counsel for Ms. Whittaker simply did not object to the trial court's ruling limiting the admissibility of this evidence and thus waived her objection thereto. Because Ms. Whittaker waived her objection, she can-

not now complain about the trial court's ruling on appeal. Consequently, we find this assignment of error also to be without merit.

**3. Admissibility of Ms. Whittaker's prior statements to police officers.** Lastly, Ms. Whittaker complains that the trial court should not have allowed the State to admit into evidence her statements to police officers when those statements had not been recorded to preserve her exculpatory comments. Specifically, she complains of the statement she gave to Trooper Christian, which statement she made while accompanying him to the crime scene, and her statement to Sergeant Mankins, which statement she made while she was being interrogated at the state police barracks. As to these statements, Ms. Whittaker says in her brief that "Appellant concedes that she was properly Mirandized before speaking to the officers, that she went to the barracks of her own accord, and that she was not promised or threatened into giving the statement." However, she asserts that neither of these statements was recorded, although the officers taking them had recording equipment available to them at that time, and that, as a result, any exculpatory comments she made in those statements were not adequately preserved.

The argument presented by Ms. Whittaker on this point is a novel one. She does not complain that her statements were not voluntary, but admits that they were freely given. And while she presents this assignment of error by claiming that "[t]he trial court erred in admitting [her] statements," the argument that she makes in her brief actually discusses her concern that the officers should have recorded these statements to preserve not only her incriminating comments but her exculpatory ones as well. Ms. Whittaker supports her argument by relying heavily upon information from the Innocence Project.[19]

Although the issue of mandatory recording of confessions or interrogations is one of first impression for this Court, it has been addressed by a few courts in other jurisdic-

---

19. According to its website, the "Innocence Project" is "a national litigation and public policy organization dedicated to exonerating wrongfully convicted people through DNA testing and re-

forming the criminal justice system to prevent future injustice." Innocence Project homepage, *available at http://www.innocenceproject.org* (last visited March 7, 2007).

tions. For example, the Supreme Court of Minnesota specifically determined that

> in the exercise of our supervisory power to insure the fair administration of justice, we hold that all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. If law enforcement officers fail to comply with this recording requirement, any statements the suspect makes in response to the interrogation may be suppressed at trial.

*Minnesota v. Scales,* 518 N.W.2d 587, 592 (Minn.1994). Likewise, the Alaska Supreme Court has also ruled that such recording is generally required: "we hold that an unexcused failure to electronically record a custodial interrogation conducted in a place of detention violates a suspect's right to due process, under the Alaska Constitution, and that any statement thus obtained is generally inadmissible." *Stephan v. Alaska,* 711 P.2d 1156, 1158 (Alaska 1985). This issue has also been addressed by a few state legislatures. *See, e.g.,* 20 Ill. Comp. Stat. 3930/7.2(d) (2004) (creating two-year pilot program requiring Illinois police to record custodial interviews of suspects investigated for first-degree murder); Me.Rev.Stat. Ann. tit. 25, § 2803–B(1)(K) (2006) (requiring establishment of policies for digital, electronic, audio, video, or other recording of law enforcement interviews of suspects in serious crimes and preservation of investigative notes and records in such cases); Texas Code Crim. Proc. Ann. art. 38.22, §§ 3(a)(1)-(2) (2006) (barring admission in any criminal proceeding of any statement made during custodial interrogation unless electronic recording is made of statement). *See generally* Steven A. Drizin & Mariss J. Reich, *Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations to Accurately Assess the Reliability and Voluntariness of Confessions,* 52 Drake L.Rev. 619 (2004).

█ Under the facts of this case, we decline to decide whether there is a state con-stitutional right for a criminal suspect to have his or her confession or interrogation recorded. Ms. Whittaker has not argued that there were some specific "exculpatory" statements that she gave to the police which the police now deny. In other words, there is no controversy regarding what Ms. Whittaker stated to the police. This Court will not decide abstract issues where there is no controversy. " 'Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes.' *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont,* 126 W.Va. 183, 185–86, 27 S.E.2d 486, 487–88 (1943)." Syl. pt. 2, in part, *Harshbarger v. Gainer,* 184 W.Va. 656, 403 S.E.2d 399 (1991). *Accord State ex rel. ACF Indus., Inc. v. Vieweg,* 204 W.Va. 525, 533 n. 13, 514 S.E.2d 176, 184 n. 13 (1999) (recognizing that "this Court cannot issue an advisory opinion with respect to a hypothetical controversy"); *State ex rel. West Virginia Deputy Sheriff's Ass'n, Inc. v. Sims,* 204 W.Va. 442, 445, 513 S.E.2d 669, 672 (1998) (reiterating that "this Court has held that we are not a body that gives advisory legal opinions"). Accordingly, we need not further consider this assignment of error.

## IV.

## CONCLUSION

After considering all of Ms. Whittaker's assignments of error, we conclude that the circuit court did not err by upholding Ms. Whittaker's jury conviction of voluntary manslaughter and sentencing her in accordance therewith. Nevertheless, we remain deeply troubled by the facts underlying this case. Under no circumstances do we condone vigilante justice. However, we sympathize with the plight in which Ms. Whittaker found herself after her numerous attempts to seek help from law enforcement authorities were unsuccessful. Ms. Whittaker's inability to obtain such assistance was due, in part, to the fact that most of Ms. Whittaker's domestic violence petitions were not served on Mr. Mills, and, thus, they were not enforced.[20]

---

20. We appreciate the fact that two of these petitions were dismissed due to Ms. Whittaker's action or inaction. *See supra* note 4. However, we also recognize that fear of retaliation by Mr. Mills may have motivated Ms. Whittaker to permit the dismissal of these filings. *See generally*

"Simply put, our law enforcement/criminal justice system utterly failed" Ms. Whittaker and J.W. *State v. Miller,* 204 W.Va. 374, 387, 513 S.E.2d 147, 160 (1998) (per curiam) (Starcher, J., concurring). Perhaps even more troubling, though, is the fact that Ms. Whittaker's case is not an isolated incident; we previously have been asked to review the convictions of domestic violence victims who have felt the need to end the cycle of abuse by resort to whatever means were at their disposal. *See, e.g., State v. Miller,* 204 W.Va. 374, 513 S.E.2d 147; *State v. McClanahan,* 193 W.Va. 70, 454 S.E.2d 115 (1994) (per curiam). Although our decision of this case stands firm, we nonetheless wish to renew our continuing commitment to ensuring the safety, security, and dignity of victims of domestic abuse, and we encourage our coordinate branches of government to do likewise.

Accordingly, the conviction of Valerie Whittaker of voluntary manslaughter, and her resultant sentence of ten years imprisonment,[21] is hereby affirmed.

Affirmed.

ALBRIGHT, Justice, dissenting:

The majority demonstrates an inability to fully comprehend the underpinnings of the battered spouse syndrome by upholding, with minimal analysis, the trial court's evidentiary rulings.[1] Although a battered women's syndrome instruction was given to the jury, the jury was wrongly prevented from hearing evidence that might have tipped the scales in favor of Appellant's affirmative defense that she was acting in self defense when she shot Mr. Mills—the man who had inflicted both mental and physical abuse upon her for ten long years.

Instead of examining whether Appellant's history of being a battered spouse warranted closer inquiry into the admissibility of the evidence at issue, the majority simply concluded that the evidence was inadmissible on hearsay grounds. In similarly shortsighted fashion, the majority described the evidence sought to be introduced by Ms. Hudgins and Ms. Fowler as too remote in time to be relevant. Incredibly, the evidence that Appellant sought to introduce through Ms. Fowler were statements made on the very day that Mr. Mills was shot. While such statements were not contemporaneous to the shooting incident, they clearly were not too remote to be relevant to Appellant's state of mind.

For more than twenty-five years this Court has recognized the significance of permitting a battered individual to introduce evidence about the abuse suffered "in order that the jury may fully evaluate and consider the defendant's mental state at the time of the commission of the offense." *State v. Dozier,* 163 W.Va. 192, 197, 255 S.E.2d 552, 555 (1979). Evidence adduced to demonstrate a long term abusive relationship, such as that between Appellant and Mr. Mills, is characterized as battered women's syndrome and is typically relied upon to prove that an abused defendant acted in self defense. *See State v. Wyatt,* 198 W.Va. 530, 541, 482 S.E.2d 147, 158 (1996) (recognizing that "the principal use of battered women's syndrome testimony has been in the context of self-defense);" *State v. Lambert,* 173 W.Va. 60, 63–64, 312 S.E.2d 31, 35 (1984) (noting that evidence of battered spouse syndrome "go[es] to negate criminal intent").

Sadly, the paradigm presented by a battered spouse is an individual who is prevented by emotional or financial obstacles, or both, from permanently escaping the envi-

---

*State v. Mechling,* 219 W.Va. 366, 379–80, 633 S.E.2d 311, 324–25 (2006) (discussing why domestic violence victims often do not cooperate with, or seek assistance from, law enforcement officials vis-a-vis their batterers).

21. Ms. Whittaker is currently on parole. *See* note 13, *supra.*

1. These rulings pertain to limiting the testimony of three defense witnesses: Ermajean Hudgins,

Sandra Brinkley, and Debra Fowler. Each of these three women was prohibited from relating to the jury any statements that Appellant made to them pertaining to instances of abusive conduct inflicted upon her by Mr. Mills on hearsay grounds. After learning of the limited nature of the testimony Ms. Brinkley could offer at trial on her behalf, Appellant chose not to call Ms. Brinkley to the stand.

rons of the abusing spouse. *See* Roberta Thyfault, *Self–Defense: Battered Woman Syndrome on Trial,* 20 Cal. W.L.Rev. 485, 488–89 (1984) (identifying economic obstacles and psychological factors, such as fear, which prevent abused women from successfully leaving abusive relationship); Loraine Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed,* 32 Hastings L.J. 895, 901–02 (1981) (recognizing emotional and economic dependency, low self-esteem, fear, and shame as explanations for why battered women remain in abusive relationships). Through the testimony of an expert witness, a jury is often educated about the prototypical patterns of abusive behavior that exist in battered spouse cases such as: "1) the escalation of the abuse in frequency and severity over time; 2) the existence of a three phase cycle of violence;[2] and 3) the jealousy of the batterer." Thyfault, *supra,* 20 Cal. W.L.R. at 486–87 (footnote added). Ideally, after hearing expert testimony on the subject, the jury will be in a better position to comprehend the battered individual's perceptions of imminent danger and, thus, to evaluate the reasonableness of her actions.

In addition to being educated about the patterns intrinsic to a battered spouse relationship, courts have recognized the need to apprise the jury of "all of the circumstances surrounding the incident." *State v. Wanrow,* 88 Wash.2d 221, 559 P.2d 548, 556 (1977) (quoting State v. Lewis, 6 Wash.App. 38, 491 P.2d 1062, 1064 (1971)); *accord Bechtel v. State,* 840 P.2d 1, 12 (Okla.Crim.App.1992) (stating that "the meaning of *imminent* must necessarily envelope [sic] the battered woman's perceptions based on all the facts and circumstances of his or her relationship with the victim"). Only when the jury has been permitted to hear and consider all of the factual information surrounding the incident, which includes a full history of prior threats and past beatings, can it properly evaluate whether the defendant had reasonable grounds to believe that she was in immediate danger. *See* Eber, *supra,* 32 Hastings L.R. at 920–23; *see also State v. Steele,* 178 W.Va.

330, 336, 359 S.E.2d 558, 564 (1987) (stating that "[t]he reason evidence of prior acts of violence ... is relevant is because it relates to the reasonableness of the defendant's belief that the deceased intended to inflict serious bodily injury or death and, as a consequence, the defendant was justified in the killing"). Without the introduction of pertinent evidence that fully explores the history of violence and threatened violence, the jury cannot attempt to discern the battered individual's perception of danger and imminent harm. As a result, the battered spouse is necessarily hampered in her ability to prove that she acted in self defense. Eber, *supra,* 32 Hastings L.R. at 920.

The majority essentially dismisses Appellant's contention that her theory of self-defense was hindered by the trial court's exclusion of testimony from three of her named defense witnesses. Because Appellant was permitted to testify about prior instances of abuse, the majority downplays the significance of statements that she made to others contemporaneous to those previous incidents. What the majority overlooks, however, is that by preventing the jury from hearing these statements, the jury was denied information that was relevant to Appellant's mental state—evidence which was offered to explain her actions and tended to support her theory that she acted in self-defense. *See State v. Pettrey,* 209 W.Va. 449, 456, 549 S.E.2d 323, 330 (2001) (recognizing that out-of-court statements offered to prove state of mind are not excluded under the hearsay rule); *see also State v. Haines,* 112 Ohio St.3d 393, 860 N.E.2d 91, 101 (2006) (recognizing that testimony on battered woman syndrome is offered as background for understanding behavior of abused individual); *People v. Coffman,* 34 Cal.4th 1, 17 Cal. Rptr.3d 710, 96 P.3d 30, 92 (2004) (upholding admissibility of expert testimony offered to establish defendant's state of mind that did not directly relate to pending criminal offenses but concerned abused defendant's relationship with victim).

2. The three phase cycle includes the initial building of tension phase, which is followed by the acute battering phase, and culminates with the abuser demonstrating contrition by apologizing,

showing remorse, acting lovingly, and often promising never to harm the abused woman again. *See* Thyfault, *supra,* 20 Cal. W.L.Rev. at 487–88.

The Oklahoma Supreme Court wisely recognized in *Bechtel* that

> [a] defendant, in a self-defense case involving the [battered women's] syndrome, in order to establish her "fear" at the time of the commission of the offense and to establish the deceased as the aggressor, must be entitled to produce past violent encounters with the deceased and to introduce evidence of the turbulent and dangerous character or reputation of the deceased. This is an established method of proof in self-defense cases, because the law recognizes the fact that future conduct may be reasonably inferred from past conduct. *Justice would not be served to hold that a defendant is limited to relating the physical act of past conduct without its accompanying words.*

840 P.2d at 13–14 (citation omitted and emphasis supplied).

Having recognized the need to introduce statements voiced by the defendant in connection with prior instances of abuse in *Bechtel,* the court addressed whether such statements fall within the prohibited area of hearsay and concluded that they did not. The court reasoned:

> Inherent in self-defense cases involving the Battered Woman Syndrome, are issues involving both the state of mind of the deceased and the defendant. An out-of-court statement, regardless of its truth, may imply intention, knowledge, physical or emotional feeling, or other state of mind .... If offered to prove such state of mind, the statement is not hearsay. An out-of-court statement, regardless of the truth, which elicits a state of mind *in another person* in consequence of the utterance is not hearsay. Such statements are circumstantial evidence and are recognized by the courts as such. We do not imply that said statements are to be admitted automatically. The trial judge may exercise his discretion to determine whether the inference sought to be drawn from the particular statement is reasonable and relevant. If not, the statement may be excluded for the lack of relevance, not on the ground of hearsay.

*Id.* at 14 (footnote omitted).

Rather than engaging in an earnest analysis of this evidentiary issue, the majority quickly dismissed the state of mind ground proffered by Appellant for admission of the banned evidence. According to the majority, "the only purpose which Ms. Hudgins' excluded statements could have served would have been to prove the truth of the matter asserted: that Ms. Whittaker had been abused and that Mr. Mills was the abuser." By preventing the jury from hearing what Appellant told Ms. Hudgins, Ms. Fowler, and Ms. Brinkley about prior instances of abuse, Appellant was denied the right to lay the proper foundation for establishing her state of mind on the day she shot Mr. Mills. Rather than being offered to prove the truth of the matter asserted, as the majority concludes, those statements were clearly offered for state of mind purposes—to demonstrate the reasonableness of Appellant's state of fear at the time of the shooting. By denying testimonial evidence from Appellant's defense witnesses regarding Mr. Mills' prior threats and abusive acts, the jury was given an incomplete narrative. Consequently, the jury was forced to decide whether Appellant acted in self-defense without the benefit of all relevant circumstances bearing on her state of mind.

Many lay people have difficulty comprehending why an act of violence was committed by a battered woman at a time when she may have seemingly had the opportunity to extricate herself from the situation. This societal misapprehension stems from an inability to fully grasp that "from the perspective of the battered wife, the danger is constantly 'immediate.' " Eber, *supra,* 26 Hastings L.J. at 929. In an emotional state that is the result of a longstanding pattern of threats followed by violence, the abused individual is acutely aware that her abuser is fully capable of carrying out the violence that he is currently threatening to commit. Because of the cumulative pattern of abuse, the abused person processes the threat of violence as an eventuality, rather than a possibility. In Appellant's case, just prior

to the shooting incident, Mr. Mills had threatened to kill both Appellant and her daughter—and this threat came immediately after he had rolled Appellant's daughter like a bowling ball across the floor. Like many long-term victims of abuse, Appellant chose to commit an act of violence as a means of protecting herself and her loved one.

To a victim of abuse such as Appellant, the majority's offer of sympathy and its recitation of a "continuing commitment to ensuring the safety, security, and dignity of victims of domestic abuse" can only be perceived as an empty gesture. As to the unserved domestic violence petitions, Appellant's previously unsuccessful experiences with the legal system may have convinced her she had no choice but to defend herself. Despite the widespread recognition of domestic abuse and the legal system's efforts to protect the abused, the discomforting reality is that victims of abuse continue to find themselves in that proverbial setting of being between a rock and a hard spot. Until both the courts and society fully appreciate the realities of domestic abuse and all its consequences, it seems unlikely that in the context of criminal prosecutions our laws will adequately and fairly address the ramifications of such abuse.

Accordingly, I must respectfully dissent.

STARCHER, J., dissenting:

I join in Justice Albright's thoughtful dissent. I also write separately to express my personal view of the instant case.

To me, the instant case is not about "self-defense." It is about the right of a mother to protect her child, and the right of a homeowner to stop a criminal from committing a violent crime in her home.

Valerie Whittaker shot a man who had brutally beaten her many times, and who came into her home in violation of a court order and feloniously attacked her daughter. Her response was what, I believe, most people would like to have the courage to do. Under these undisputed facts, I would simply reverse Ms. Whittaker's conviction. The evi-

dence in this case permitted only one result—justifiable homicide in the defense of a child and the sanctity of the home. The jury should have been so directed.

The facts in the instant case resemble the facts of *State v. Miller*, 204 W.Va. 374, 513 S.E.2d 147 (1998). In that case, a woman was convicted of a homicide against a man who had horribly battered her—and the State of West Virginia utterly failed to protect her.

In my concurrence in the *Miller* case, I said:

David Stinson's threats, curses, and rages—his backhands to Penny Miller's face, his fist punching her belly, his foot kicking her as she lay on the floor—Penny's puffy lips and swollen eyes, her cuts and bruises and bandages, her loose teeth and bleeding gums—the nights of terror for Christopher and Cheyenne, the curses and the blows landing on their mother—the lies, the insults, the broken promises—the fear, shame, isolation, failure, resignation and numbness—all of this, the fruits of David Stinson's abuse—*came home to roost* when David Stinson was shot to death by his own son.

One may wonder, as Davis Stinson lay bleeding to death on a trailer porch, did he have time to feel that he had finally been brought to account for his crimes—and by a person uniquely qualified to appreciate their gravity?

In the *Miller* case, as in the instant case, this Court shied away from squarely and fairly confronting the issues before it. As Justice Albright suggests in his dissent, rhetoric from this Court decrying domestic violence is no substitute for strictly enforcing fairness in the courts for women who take action against their abusers.

Accordingly, I dissent.[1]

MAYNARD, Justice, concurring:

Practically everyone knows who Paul Harvey is. He is a popular radio commentator who looks beyond the headlines and lets his

---

1. The reality of the instant case, I fear, is that because Ms. Whittaker is no longer incarcerated, the majority has given "short shrift" to her legitimate legal and human claims.

listeners know "the rest of the story." I am writing separately because this is a "Paul Harvey" case and the rest of this story needs to be told. My dissenting colleagues, who deliberately omitted critical facts in their dissents, would have you believe that the appellant was a battered woman who, after suffering mental and physical abuse by Mr. Mills for ten years, shot him in self-defense and that because of certain rulings by the trial court, which were affirmed by the majority, she was prevented from offering evidence of that abuse. That is a preposterous and outrageous claim and is simply not what happened.

The record in this case shows that Ms. Whittaker shot and killed an unarmed man. After she killed him, she went to another room and retrieved a shotgun. She then placed that shotgun in the dead man's hands and put his finger on the trigger. Next, the appellant called the police and repeatedly lied about what happened. She lied when she told the police that Mr. Mills had the shotgun in his hands and was threatening to kill her when she shot him. She told this false story in two separate recorded statements. Only after further questioning did the appellant finally admit that she had lied and that Mr. Mills was actually unarmed at the time she shot him. At trial, the appellant curiously claimed for the first time that Mr. Mills had mistreated their child immediately before she killed him, a story she never told in any of her many prior statements.

I do not dispute the fact that Mr. Mills was abusive toward the appellant and their daughter. He was a brute and a very bad man. The evidence in the record shows that the appellant obtained four domestic violence petitions against Mr. Mills during the course of their relationship and that she left him and went to a battered woman's shelter with their daughter. The jury heard this evidence. The jury also heard exactly what happened on the day Mr. Mills was shot and killed by the appellant. In particular, the jury heard all of the lies the appellant told the police about what actually happened at

the time of the shooting. Moreover, the jury learned that the appellant placed a gun in Mr. Mills' hands after she shot him. Curiously, the dissenters make no reference to these facts.

On the day she shot Mr. Mills, the appellant left her aunt's house where she had been staying and went to a doctor's appointment knowing that Mr. Mills also had an appointment with the same doctor that day. Mr. Mills was there waiting for her with her purse. The appellant testified at trial that she attempted to leave the doctor's office, but Mr. Mills forced her to keep the doctor's appointment. Then, according to the appellant, even though they were in separate cars, Mr. Mills forced her to follow him to the pharmacy, a gas station, and then home to her trailer where they were living. After being home for a short time, Mr. Mills decided to go to a friend's house to pick up a weed eater. According to the appellant, Mr. Mills forced her and their daughter to go along. After visiting the friend for an hour or so, they left and stopped at a convenience store before returning home. According to the appellant, as soon as they arrived home, Mr. Mills began threatening to kill her, their daughter, and other members of her family. Within a few minutes, Mr. Mills was dead. The appellant shot him from seventeen feet away with a gun she retrieved from a kitchen cabinet. Although the appellant claimed to have never used a gun before, she killed Mr. Mills instantly with a single shot to the head.

After she shot Mr. Mills, the appellant called the state police [1] and reported,

> I was at my home and I had a domestic violence petition against my baby's daddy and he was going to come in and he tried to kill me he grabbed the shotgun he pulled the trigger back when he did I had to shoot him[.]

When the state police arrived, the appellant told Trooper Christian that Mr. Mills had been threatening to kill her; that he went to the back of the trailer and got a shotgun; that he went out the back door; and then, he came back through the front door with the

1. The appellant called the state police rather than 911 and asked to speak to Trooper Christian. Apparently, she had called Trooper Chris- tian weeks before and reported that Mr. Mills was driving his four-wheeler while drunk.

shotgun. The appellant told Trooper Christian that when she saw Mr. Mills with the shotgun, she grabbed a gun she knew he kept in a kitchen cabinet and shot him. She further told Trooper Christian that her daughter was with her in the kitchen curled up in a ball on the floor and that after she shot Mr. Mills, she did not go near his body but rather, grabbed her daughter and went next door to her parents' house.

When Trooper Christian entered the trailer, he noticed that Mr. Mills was lying in the front doorway with a shotgun in his hand-his finger on the trigger and his thumb on the hammer. There were no blood splatters on the gun, but there were footprints in the blood on the floor. At that point, Trooper Christian became suspicious. The appellant had told him that no one else had been in or near the trailer during or after the shooting. Trooper Christian found it curious that a man who had fallen to the floor after being shot was holding a clean shotgun with his finger on the trigger.

Trooper Christian questioned the appellant again at the scene where she gave the following recorded statement,

> Then when I got there, I went into the trailer, he grabbed a pair of plyers [sic] and telling me to call you all and tell you that I was gonna drop the DVP. Then he laid it down, then he was cussing me and then he walked. I don't remember which way he went and [J.W.] was there. And then he . . . oh . . . he went back toward the bedrooms and then apparently he went outside and I was turned talking to [J.W.]. And then he, apparently he must have come around the trailer with the shotgun and come through the door.

The appellant further stated that she did not know if the shotgun was loaded, and at that point, she pulled out the gun that she knew Mr. Mills kept in the cabinet below the kitchen sink and shot him.

The appellant went to the state police detachment that evening where she consented to further questioning. During a third statement, the appellant finally admitted that Mr. Mills was not armed with the shotgun when she killed him. She said,

> He had picked up the pliers and he threatened to kill me with 'em, he'd done draw'd 'em back.
>
> . . . .
>
> [J.W.] hollered and he started to go ahead and hit me and he said no that he was gonna get the shotgun and blow us all away, that a shotgun wouldn't leave no trace.
>
> . . . .
>
> And then when he started like he was gonna go get the shotgun
>
> . . . .
>
> I mean cause he was threatening to kill my baby, my mom, my myself, my mother, my daddy.
>
> . . . .
>
> My brother and sister. The first thing that went through my head was grab the gun and shoot him before he kills all of us.
>
> . . . .
>
> And that's just what I did. I grabbed the gun immediately and I just shot.

When asked about the shotgun in Mr. Mills' hands, the appellant said that she got it from their bedroom and placed it in his hands "because he said that he was gonna get it, so I just gave it to him."

In addition to Trooper Christian, the appellant spoke to two other police officers. She told Sergeant Mankins that she put the shotgun in Mr. Mills' hands because she wanted it to appear that he had threatened her and her daughter. She further told Sergeant Mankins that it was her daughter's idea to put the gun in Mr. Mills' hands. When she talked to Trooper Maddy, she said that her daughter had not been with her in the kitchen, but rather she had sent J.W. to her room before the shooting occurred. At trial, the appellant told the jury that before she shot Mr. Mills, "he run and grabbed [J.W.] by her hair and her shirt, like this (demonstrating), run her down the hall and he rolled her in her bedroom across the floor like bowlin' ball." She testified she did not tell the police this happened because she did not want to involve her daughter and did not want her to have to answer questions.

All of the above evidence was presented to the jury through the testimony of Trooper

Christian, Trooper Maddy, Sergeant Mankins, and the appellant, who was her own first witness. The tape-recorded statements of the appellant were also played for the jury. In addition to this evidence, the jury heard a considerable amount of testimony about the character of the victim, especially his propensity for violence. In that regard, the appellant presented evidence from at least two witnesses who had confrontations with Mr. Mills while he was in possession of a firearm. The appellant was also permitted to present medical records showing that Mr. Mills had shot himself in the foot with a shotgun while riding around at night spotlighting deer. As discussed in the majority opinion, the appellant introduced into evidence Mr. Mills' cock fighting paraphernalia to show that he was engaged in "blood sports." The appellant further introduced into evidence several hunting trophies and a stuffed and mounted head of a boar to show that Mr. Mills was an expert at "hunting, tracking, and killing."

The appellant also presented the testimony of several witnesses who related their observations regarding the relationship between Mr. Mills and the appellant. A cousin of the appellant, Michael Starkey, who was also a neighbor to her and Mr. Mills for some time, testified that he saw the appellant and Mr. Mills fighting in the middle of the road on one occasion. He said that Mr. Mills kept trying to grab the appellant by her arm. Mr. Starkey further testified that Mr. Mills would not let the appellant be outside for very long and that he frequently heard him telling her to get back in the house. Ermajean Hudgins, while not permitted to relate statements made to her by the appellant, nonetheless testified that the appellant came to her church approximately five times in the last two and a half years and appeared to be very fearful of Mr. Mills. She said that the appellant's daughter was "very clingy to her mother and afraid." Debra Fowler testified that Mr. Mills called her house three times looking for the appellant during the week before he was killed.

Despite the claims of my dissenting colleagues that the appellant was precluded from presenting evidence to support her the-ory of self-defense, a thorough reading of the transcript of the trial in this case shows that the appellant was permitted to present considerable evidence to support her claim that she acted in self-defense. The few hearsay statements which the trial court properly precluded Ms. Hudgins, Ms. Fowler, and Ms. Brinkley from relating to the jury were just a small portion of the evidence which the appellant sought to and did introduce in her defense.

The fact of the matter is that the jury heard the appellant's version of events as well as substantial evidence that contradicted her story and established that she had made conflicting statements to the police. The appellant presented evidence to show that she suffered constant threats and abuse from Mr. Mills for ten years; that she filed four domestic violence petitions against Mr. Mills; that she believed that the police were never going to help her escape Mr. Mills' abuse; that she believed that Mr. Mills was going to kill her, their child, and her family; and finally, that she believed the only way she could protect herself and her daughter was to shoot him.

On the other hand, the prosecution established that the appellant had many opportunities to get away from Mr. Mills on the day she shot him. The prosecution's evidence showed that the appellant could have reported to her doctor that Mr. Mills was waiting for her when she arrived for her appointment and that he was forcing her and her child to leave with him; that she could have asked for help at the pharmacy, at the gas station, at the friend's house, or at the convenience store; and that she could have simply stopped at the police station when she passed by while following Mr. Mills in her own car. The prosecution's evidence further established that the appellant shot an unarmed man from seventeen feet away and killed him with one bullet; that she put a shotgun in the deceased's hands after she killed him; that she lied to the police at every turn; and that her story changed even on the day she testified in court when she claimed for the first time that Mr. Mills had grabbed [J.W.] and "rolled her in her bedroom across the floor like bowlin' ball" right before she shot him.

Obviously, after hearing all of the evidence, the jury simply did not believe the appellant. In the end, self-defense cases are all about credibility. Long ago, this Court explained that self defense is "a question purely of fact, dependent absolutely upon the credibility of the witnesses, and the weight and effect of their evidence; purely a jury question." *State v. Dickey,* 48 W.Va. 325, 335, 37 S.E. 695, 699 (1900). Would I have made the same determination as the jury? It does not matter. This Court cannot second guess a jury when its decision is supported by sufficient evidence as is clearly the case here. This Court can only decide whether the defendant received a fair trial. She did.

The statements of the three witnesses that the appellant sought to introduce were clearly hearsay and were properly excluded. In *State v. Riley,* 201 W.Va. 708, 714, 500 S.E.2d 524, 530 (1997), this Court observed,

> We have previously permitted introduction of evidence regarding the battered spouse syndrome, and the lower court in the present case admitted substantial evidence on this issue offered by the Appellant. In syllabus point five of *State v. Steele,* 178 W.Va. 330, 359 S.E.2d 558 (1987), for instance, we held that "[e]xpert testimony can be utilized to explain the psychological basis for the battered woman's syndrome and to offer an opinion that the defendant meets the requisite profile of the syndrome." Conferring the right of introduction of evidence upon a defendant, however, does not translate into authority to engage in an unlimited foray into the issue. The court still possesses the right to limit the testimony; when it becomes duplicative, the court may refuse to accept additional witnesses.

(Footnote omitted.). Clearly, the trial court also possesses the right to prohibit the introduction of hearsay testimony.

Finally, I would note that the appellant could have been convicted of first degree murder without mercy and could have spent the rest of her life in jail. The jury concluded, however, that she was only guilty of the lesser included offense of voluntary manslaughter. Now, nobody wants you to believe that the deceased was a nice guy. As I said earlier and as the record plainly shows, he was not! What kind of society would we live in if men were allowed to batter and abuse their wives and children with impunity. The law should never say that kind of conduct is acceptable. It is not. At the same time, we also do not want to make rules that allow someone to shoot and kill an unarmed man with impunity—even *a bad man.*

Because the appellant received a fair trial and because the evidence was more than sufficient to support the jury's verdict, I respectfully concur with the majority's decision in this case. And now, you know the rest of the story.